UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL PARTNERS, LP
and AURELIUS CAPITAL MASTER, LTD., :

                Plaintiffs,     :     07 Civ. 2715 (TPG)

    - against -             :       **OPINION**

THE REPUBLIC OF ARGENTINA,     :

             Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

<div style="border:1px solid black; padding:4px;">
USDC SDNY<br>
DOCUMENT<br>
ELECTRONICALLY FILED<br>
DOC #: _____<br>
DATE FILED: 12/11/08
</div>

## Additional Cases

Lightwater Corp. Ltd. v. Republic of Argentina 02 Civ. 3804
Old Castle Holdings, Ltd. v. Republic of Argentina 02 Civ. 3808
Allan Applestein TTEE FBO D.C.A. Grantor Trust, et al. v. Republic of Argentina  02 Civ. 4124
Etevob et al. v. Republic of Argentina & Province of Buenos Aires 03 Civ. 1680
EM Ltd. v. Republic of Argentina 03 Civ. 2507
Franceschi et al. v. Republic of Argentina 03 Civ. 4693
Mazzini et al. v. Republic of Argentina 03 Civ. 8120
NML Capital Ltd. v. Republic of Argentina 03 Civ. 8845
Denchu Investment Corp. v. Republic of Argentina 03 Civ. 9538
Prima et al. v. Republic of Argentina & Province of Buenos Aires 04 Civ. 1077
Mazoral S.A. v. Republic of Argentina 04 Civ. 3313
Morata et al. v. Republic of Argentina 04 Civ. 3314
Moldes et al. v. Republic of Argentina & Province of Buenos Aires 04 Civ. 6137
Cilli et al. v. Republic of Argentina 04 Civ. 6594
Buczat et al. v. Republic of Argentina 04 Civ 7056
Rosa et al. v. Republic of Argentina 04 Civ. 7504
Consolini et al. v. Republic of Argentina 05 Civ. 177
Legnaro et al. v. Republic of Argentina & Province of Buenos Aires 05 Civ. 178
NML Capital Ltd. v. Republic of Argentina 05 Civ. 2434
Martinez et al. v. Republic of Argentina 05 Civ. 2521

Ferri et al. v. Republic of Argentina 05 Civ. 2943
Rigueiro et al. v. Republic of Argentina 05 Civ. 3089
Sauco et al. v. Republic of Argentina 05 Civ. 3955
Capital Ventures International v. Republic of Argentina
05 Civ. 4085
Bettoni et al. v. Republic of Argentina 05 Civ. 4299
Fedecostante et al. v. Republic of Argentina 05 Civ. 4466
Meridian Investments & Business Corp. v. Republic of Argentina
05 Civ. 5197
Lisi et al. v. Republic of Argentina 05 Civ. 6002
Rossini et al. v. Republic of Argentina & Province of Buenos Aires
05 Civ. 6200
Klein et al. v. Republic of Argentina 05 Civ. 6599
Lovati v. Republic of Argentina 05 Civ. 8195
Botti et al. v. Republic of Argentina & Province of Buenos Aires
05 Civ. 8687
GMO Emerging Country Debt LP v. Republic of Argentina
05 Civ. 10380
GMO Emerging Country Debt Investment Fund PLC v. Republic of
Argentina 05 Civ. 10382
GMO Emerging Country Debt Fund v. Republic of Argentina
05 Civ. 10383
Pasquali et al. v. Republic of Argentina 05 Civ. 10636
Capital Ventures International v. Republic of Argentina 06 Civ. 207
Bolland et al. v. Republic of Argentina 06 Civ. 3196
Amoroso et al. v. Republic of Argentina 06 Civ. 3197
Bliway International S.A. v. Republic of Argentina 06 Civ. 3198
Schwald et al. v. Republic of Argentina 06 Civ. 6032
NML Capital Ltd. v. Republic of Argentina 06 Civ. 6466
Ivelo Holding Corp. v. Republic of Argentina 06 Civ. 7100
Tadayon v. Republic of Argentina 06 Civ. 14299
Beyer et al. v. Republic of Argentina 07 Civ. 98
Palladini et al. v. Republic of Argentina 07 Civ. 689
Catto et al. v. Republic of Argentina 07 Civ. 937
NML Capital Ltd. v. Republic of Argentina 07 Civ. 1910
Dolcetti et al. v. Republic of Argentina 07 Civ. 2607
NML Capital Ltd. v. Republic of Argentina 07 Civ. 2690
Blue Angel Capital I LLC v. Republic of Argentina 07 Civ. 2693
Baccanelli v. Republic of Argentina 07 Civ. 2788
Baccanelli v. Republic of Argentina 07 Civ. 3851
Andrarex Ltd. v. Republic of Argentina 07 Civ. 5593
Borgra et al. v. Republic of Argentina 07 Civ. 5807

NML Capital Ltd. v. Republic of Argentina 07 Civ. 6563
Milanesi et al. v. Republic of Argentina 07 Civ. 7248
Heeb et al. v. Republic of Argentina 07 Civ. 10656
HWB Victoria Strategies Portfolio, et al. v. Republic of Argentina
07 Civ. 10657
Aurelius Capital Partners, LP et al. v. Republic of Argentina
07 Civ. 11327
HWB Victoria Strategies Portfolio et al. v. Republic of Argentina
07 Civ. 11382
Erb et al. v. Republic of Argentina 07 Civ. 11495
Zylberberg Fein LLC v. Republic of Argentina 07 Civ. 11496
U.V.A. Vaduz et al. v. Republic of Argentina 07 Civ. 11497
Amber Reed Corp. et al., v. Republic of Argentina 08 Civ. 440
NML Capital Ltd. v. Republic of Argentina 08 Civ. 2541
NML Capital Ltd. v. Republic of Argentina 08 Civ. 3302
Etcheto et al. v. Republic of Argentina 08 Civ. 4902
Hagemann v. Republic of Argentina 08 Civ. 5436
Brandes et al. v. Republic of Argentina 08 Civ. 6625
NML Capital Ltd. v. Republic of Argentina 08 Civ. 6978

## Introduction

This opinion deals with the latest stage of the litigation arising out

of the massive default in 2001 by the Republic of Argentina in connection with

its bonds.  The main difficulty in the numerous lawsuits filed in this court

relates to how the plaintiffs can recover on judgments which had been entered

and which are likely to be entered.  The plaintiffs in 72 cases are now seeking

to reach assets, believed to be on deposit in New York City, which belong to

certain public and private Argentine pension funds.  The current applications

to the court were precipitated by legislation, which was then being proposed

that would nationalize the private pension funds.  The legislation would bring

the assets of these funds into what plaintiffs claim to be a branch of the

Argentine Government.  The proposed legislation has now been enacted into law, as will be later described.

The court has determined that plaintiffs have made a sufficient showing that the assets involved in the present applications are subject to attachment and execution, and have further made a sufficient showing that the transfer of these assets, particularly transfer out of the United States, should be restrained.

<div align="center">Procedural History</div>

On October 29, 2008 the court signed an Order to Show Cause in three cases against the Republic of Argentina based on defaulted bonds.  Two of these cases are brought by Aurelius Capital Partners (07 Civ. 2715 and 07 Civ. 11327) and the third case is brought by Blue Angel Capital (07 Civ. 2693).  These cases will hereafter be referred to as "the Aurelius cases."  The October 29 Order to Show Cause set down for hearing a motion to authorize the U.S. Marshals Service to serve a Writ of Execution covering property in New York belonging to an Argentine entity known as Administracion Nacional de Seguridad Social ("ANSES"), and also belonging to ten Argentine pension funds (Fondo de Jubilaciones y Pensiones, hereafter collectively "FJP Funds" or "FJPs").  The motion also seeks court approval for the issuance of Restraining Notices dealing with the properties referred to above.  The Order to Show Cause also provided that, pending a hearing on the main motion, plaintiffs were

authorized to deliver the Writs of Execution to the Marshals Service, although the Marshals Service was directed to defer serving the Writs of Execution or levying upon any property until further order of the court. Plaintiffs were authorized in the Order to Show Cause to make immediate service of the Restraining Notices, the purpose being to prevent removal of any of the subject property from the United States. Plaintiffs in these cases filed with the Order to Show Cause a Declaration of Barry R. Ostrager and a Memorandum of Law, both dated October 29. The Order to Show Cause was originally returnable November 6, but was adjourned to November 14.

Six additional Orders to Show Cause covering 58 cases were signed on November 5, November 6, November 7, and November 12. With the exception noted below, these contained essentially the same provisions as were contained in the Aurelius orders, and were returnable November 14. An additional Order to Show Cause with the same provisions was signed on November 19, returnable on November 25. All but one of these orders were in cases where judgments have been entered.

In seven of the 58 cases judgments had not been entered, and one of the November 6 Orders to Show Cause was for attachments in these seven cases, together with restraints preventing removal of property out of the United States.

In ten additional cases a somewhat different procedure has been

used, although the objective is the same - that is, to prevent the transfer of assets belonging to ANSES and the FJPs out of the country pending further order of the court.

In two of these cases - 03 Civ. 8845 (brought by NML Capital) and 03 Civ. 2507 (brought by EM) - judgments have been obtained.  In these cases the plaintiffs requested the court to sign a "Restraining Order" authorizing them to serve restraining notices with respect to the properties referred to earlier in this opinion.  The court signed this Restraining Order on October 31.  Among other things, it directed that plaintiffs should move within 10 days after the levy to confirm the Restraining Order.

In the remaining eight cases (all brought by NML Capital), judgments have not been obtained.  In these cases NML Capital submitted an Order of Attachment, which the court signed on October 31.  The cases are:

    05 Civ. 2434
    06 Civ. 6466
    07 Civ. 1910
    07 Civ. 2690
    07 Civ. 6563
    08 Civ. 2451
    08 Civ. 3302
    08 Civ. 6978

The Order of Attachment directed the Marshals Service to serve the Order of Attachment with respect to the property referred to earlier in this opinion, but to refrain from taking property into custody pending further order of the court.  NML Capital was directed to move within 10 days after the levy to confirm the

Order of Attachment.

On November 7 the court signed a Modified Restraining Order for NML Capital and EM and also signed a Modified Order of Attachment in the NML Capital cases. The modifications provided that the processes were intended to restrain the transfer of ANSES and FJP property outside of the United States and were not intended to prevent or restrain day-to-day investment management. The Modified Restraining Order omitted the provision about a motion to confirm, which was retained only in the Modified Order of Attachment.

NML Capital moved to confirm the attachment order by Notice of Motion which was dated November 12 and which was served on November 13. The motion was returnable on November 14. The motion was supported by Declarations of Martin Esteban Paolantonio and Suzanne M. Grosso, both dated November 12, and by a Memorandum of Law of the same date.

On November 12 the Republic of Argentina filed a motion to vacate the restraining orders and writs of execution in the Aurelius cases. This motion was accompanied by the declaration of Adrian Esteban Cosentino dated November 11 and a Memorandum of Law of the same date.

ANSES, although it is not a party to any of these actions, filed several declarations and a Memorandum of Law, all dated November 11. The various FJP Funds were represented by two different law firms, each of which

filed a Memorandum of Law dated November 11.  They also filed several declarations.

On November 14, counsel for the Republic of Argentina sent the court a letter requesting that the Republic's submissions in connection with the Aurelius cases be considered by the court in connection with all 71 cases then involved in the various applications.  The list of these 71 cases, attached to the letter, included not only those which followed the format of the Aurelius Orders to Show Cause, but also the NML Capital and EM cases.  In other words, the Republic made no separate, specific response to the Motion for Confirmation submitted by NML Capital and the submissions in support of the latter motion.

On November 13 and 14, counsel for ANSES and the FJPs submitted a number of letters to the court asking that their submissions in connection with the Aurelius cases should be considered in connection with all cases.  ANSES and the FJPs, like the Republic of Argentina, did not submit any further memorandum of law or declarations in response to the NML Capital and EM Motion for Confirmation.  However, in a letter dated November 14, counsel for ANSES did address a brief comment to the Paolantonio declaration, which had been submitted by NML Capital and EM.

Plaintiffs in the Aurelius cases submitted a Reply Memorandum of Law dated November 13.

A hearing was held on November 14.  It appeared at that time that there were factual issues deserving development by way of discovery, and the court urged the greatest promptness in pursuing such discovery.  However, subsequent correspondence has indicated that the time required for discovery is greater than the court hoped.  Accordingly, the court held a telephone conference with the attorneys on November 25, and advised them that the court feels it necessary in this unusual case to issue an opinion promptly, going as far as possible in dealing with the issues on the present record.

## The Issues

The lawsuits before the court are, of course, against the Republic of Argentina.  A few of them also name the Province of Buenos Aires, but it is the claims against the Republic which are now the concern of the plaintiffs and the court.

The forms of process described earlier in this opinion are directed to assets of ANSES and the FJP Funds.  At the time the various orders were signed, the legislation designed to move the assets of the FJP Funds into ANSES had been proposed by the President of Argentina and was proceeding through the Argentine Congress.  It was passed by the Argentina House of Representatives on November 7 and by the Senate on November 20.  Then there was a hiatus before the final steps were taken for the legislation to become law.  The needed final steps were signing of the legislation by the

President and publication in the Official Gazette.  During this hiatus the court embarked upon the preparation of the present opinion.  However, on December 9 the President signed the legislation and it was published in the Official Gazette.  The effect of the new law is to accomplish what plaintiffs forecast would happen - i.e., the assets of the FJP Funds are transferred to the public pension fund entity, ANSES.

There are $200 million of the FJP Funds in New York, mainly deposited in investment accounts.  ANSES has represented that, prior to the transfer under the new law, it maintained no property in New York.  Now, the $200 million will be transferred from the FJP Funds to ANSES.  Presumably, this means that the issues about enforcement of the court orders will now be issues about whether there can be attachments or executions as to ANSES, rather than the FJP Funds.

Despite what has just been said, this opinion deals at some length with the FJPs.  Since the $200 million was in the hands of the FJPs at the time the orders were signed, it is necessary to determine whether those orders as to the FJPs were valid at the time.  Also, the history of the relationship between the Argentine Government and the FJPs is relevant to show a pattern of conduct by the Government in misusing pension funds.

Facts

I.    Before the New Legislation

    A.    The Pension System
          As It Was Supposed To Be

The Argentine Government is required by the Argentine constitution to provide "the benefits of social security" through "compulsory social insurance" administered by "national or provincial entities with financial and economic autonomy."  Const. Arg. art. 14 bis.  The Argentine pension system has gone through different forms.  Apparently at one time in the past there was considerable criticism of the fact that the Argentine Government was misusing funds dedicated to supporting pension payments, and was actually using such funds for other Governmental purposes.  This led to the establishment of a private pension system known as the "Capitalization System."  Under the Capitalization System, workers made contributions to accounts in investment funds known as FJPs, which were administered by private corporations known  as AFJPs.

However, a public pension system remained, known as the "Distribution System."  Under this system benefits were provided based on payroll deductions and taxes.  The public system was administered by ANSES.  According to the decree establishing ANSES, it is a "decentralized entity" that operates under "the jurisdiction of the Ministry of Labor and Social Security."  Decree No. 2741/1991, Dec. 26, 1991, art. 1.  This decree provides that ANSES

-12-

is to be headed by an Executive Director appointed by the Ministry of Labor and Social Security and that it has the power to manage its own administration and finance, independent of the National Treasury.  Id. art. 3.  Under Argentine law, ANSES can enter into contracts, sue and be sued, and acquire assets in its own name.  Argentine law also provides that ANSES assets cannot be attached and can only be used for payments to beneficiaries.

Until 2007 there apparently was no attempt to "fund" the public system pensions, in the sense of establishing a pool of capital assets for that purpose.  However, in 2007 the Argentine Government created what is known as the "Guarantee Fund."  Decree No. 897/2007, July 12, 2007, art. 3.  The Guarantee Fund is funded by the assets of workers who moved from the private pension system to the public system, as well as ANSES budget surpluses and investment returns.  The decree establishing the Guarantee Fund authorizes ANSES to invest its assets in foreign and domestic securities and interest-bearing accounts.  Id. art. 4.  The Guarantee Fund is managed by an "Investment Management Committee," which is composed of the ANSES Executive Director, the Secretary of Treasury of the Ministry of Economy and Production, and the Secretary of Finance of the Ministry of Economy and Production.  Id. art. 1.  Investments are to be made to meet criteria of "safety and profitability" as defined by the Investment Management Committee.  Id. art. 8.

-13-

It was earlier stated that the private pension system was established at least in part to protect against misuse of public pension funds by the Argentine Government.  Accordingly, there were various Argentine legal provisions having the obvious purpose of protecting the private funds -- the FJPs -- from misuse.  Each FJP was administered by an AFJP, a corporation whose sole function was to administer a "retirements and pensions fund" and make "payments and benefits pursuant to" the pension law.  Law No. 24,241, Oct. 13, 1993, art. 59.  Law No. 24,241 is often referred to as the "Pension Laws."  Funds paid into an FJP were maintained in individual accounts, separate from the assets of the AFJP itself.  The law provided that these assets could be used only to generate social security benefits, did not belong to the AFJP, and were not subject to attachment.  Law No. 24,241, art. 82.

Article 74 of Law No. 24,241 established broad investment guidelines for FJP assets and set out which types of investments are authorized or permitted.  Assets were to be invested "in accordance with the criteria of acceptable safety and profitability."  Apparently the actual investing was done by the AFJPs.

The AFJPs were supervised by the Superintendency of Retirement and Pension Fund Administrators, "an independent entity with functional and financial autonomy under the jurisdiction of the Ministry of Labor and Social Security."  Law No. 24,241, art. 117.

B.     Misuse of the Pension
       System by the Government

The information contained in this section of the opinion comes

largely from the submissions of NML Capital and EM dated November 12, and

those of the Aurelius plaintiffs dated November 13.

There has been no response from the Republic, ANSES, or the

AFJPs, to plaintiffs' submissions of November 12 and 13, except for a brief

conclusory paragraph in the letter from counsel for ANSES dated November 14.

As noted earlier in this opinion, the letter from counsel for the Republic dated

November 14 stated that the Republic would rest on its earlier submissions.

Those earlier submissions did not, of course, respond to plaintiff's memoranda

and declarations dated November 12 and 13.

This inevitably means that the plaintiffs' submissions of November

12 and 13 are not refuted on the record now before the court.[1]

Plaintiffs do not dispute the basic facts regarding the structure of

ANSES, the FJPs and the AFJPs, or the existence of restrictions in Argentine

law on the use of ANSES and FJP assets.  However, plaintiffs contend that the

structures and legal restrictions have been either disregarded or manipulated

by the Argentine Government so that the Government has in fact used ANSES

---

[1] Although the return date of the various motions was November 14 and
a hearing was held on that date, no ruling was made on that date and the
issues were left open for discovery.  The court did not set a deadline or limit on
briefing.

-15-

and the FJPs virtually at will to provide funds for non-pension Governmental purposes.

The device for this has mainly been for the Government to cause pension fund assets to be "invested" in debt instruments issued by the Republic. It should be noted, before going further, that anyone who has observed the years of litigation in this court about the huge Argentine debt default of 2001 (including the resistance in every possible way to avoid paying lawful judgments on this debt) can only conclude that any idea that such debt meets a test of "acceptable safety" is a complete departure from reality. Beyond this, the record in the present motions strongly indicates that the use of pension funds to purchase Argentine debt had, at least in large part, a far different purpose than making safe and profitable investments to benefit the pension funds. Such purpose was to effectively appropriate funds for non-pension governmental uses.

Article 74 of the pension law originally provided that only 50% of the total assets of an FJP could be used to buy Argentine public debt securities. However, in November 2001, shortly before the debt default, the Government issued Emergency Decree 1387/2001 to amend Article 74 so as to provide that 100% of the assets of an FJP could be invested in Argentine public debt securities as long as there was collateral such as tax revenues. This change was not made by legislation, but by decree issued by the  Executive.

Shortly after the above decree the Government issued Emergency Decree 1572/2001, which mandated that the AFJPs invest approximately $2 billion - a substantial portion of the total assets - in Republic bonds maturing in 120 days. All these bonds were defaulted 30 days after their issuance. There are two basic facts about this incident. The decision that such an investment should be made did not come from the AFJPs but from the Government. Moreover, the purpose was not to have FJP assets invested safely and profitably, but to take money for non-pension uses by the Government.

Pension fund managers were given substantial protection against the risks of investing in Republic debt. The AFJPs were generally required to write off defaulted securities on their books. However, Argentina's public debt securities were exempted from this requirement. See Superintendency Instruction No. 22/2003. Thus, AFJP managers who invested in the public debt were permitted to disguise actual losses caused by defaults.

The Government has been able to obtain increased financing from FJP assets by raising the amount which may be invested in Argentine public securities, mainly debt, but also by taking steps to reduce the amount of other permissible investments. For instance, in October 2007 the AFJPs were required to repatriate almost all of their investments in Mercosur countries (mainly Brazil), by reducing the percentage that could be invested in such countries to 2% of total assets. In October 2008 the amount was reduced to

zero percent.

The percentage of FJP assets invested in Argentine Government securities, including public debt, has been very large, as shown by the following table.  This has been true even after 2001, when the huge default occurred.

### Percent of Assets of FJPs in Argentine Government Securities (including Public Debt)

| | |
|---|---|
| 1998 | 49.99 |
| 1999 | 52.30 |
| 2000 | 54.62 |
| 2001 | 67.97 |
| 2002 | 76.69 |
| 2003 | 68.15 |
| 2004 | 61.17 |
| 2005 | 56.95 |
| 2006 | 53.61 |
| 2007 | 50.60 |

As of October 15, 2008 FJPs held $26.3 billion in assets, 55% of which was invested in Government debt.

Turning back to ANSES, the Guarantee Fund of that entity has only recently been established, and there is not, as in the case of the FJPs, a record of several years with regard to investments.  However, certain information is available.

An article in La Nacion of June 3, 2008 was entitled "The Justification For Financing The Government With Funds Of ANSES.  The Organization Plans To Buy More Bonds."  The article quoted Amado Boudou,

executive director of ANSES, as defending the official policy of allocating funds

from the Guarantee Fund to finance the public sector.  Boudou stated that

Guarantee Fund assets would be used to finance projects that are labor

intensive so as to create jobs, which in turn would help sustain the benefits

program.  The article stated that ANSES currently had a Treasury note for

$2.75 billion that would mature next April.  There was another note for $500

million that would mature in the middle of next March.[2]  The first transaction

involved an investment "already extended past its original maturity."  Both

were ordered under resolutions of the Ministries of the Treasury and of

Finance, which are part of the Ministry of the Economy.  The article stated that

the Ministry of the Economy expected "greater investments among Government

bodies due to problems of obtaining funds to pay debt in the investment

market."

The decree establishing the Guarantee Fund of ANSES specified

that there would be a detailed annual report regarding all actions taken in the

management of the Guarantee Fund.  Decree 897/2007 art. 8(d).  However,

there is no evidence that such a report has been prepared as of the present

time.  Plaintiffs contend that there is almost no publicly available information

regarding the investments that have actually been made out of the Guarantee

---

[2]   The reference to these amounts in dollars is apparently erroneous.  It
appears that these were peso amounts.

-19-

Fund.  This contention is not denied.

An article in La Nacion dated September 11, 2008 stated that the Government this year has resorted, to an unprecedented extent, to the funds in public institutions, especially ANSES, "to close its fiscal accounts."  The day before the article the Official Gazette announced the placement of a new Treasury bill in ANSES, which was the third transaction of this type during the year, and also the largest: 1.4 billion pesos.  This raised the Government's liability to ANSES to 5.95 billion pesos, almost 50% more than what it was at the end of 2007.  The article confirmed that up to 65% of the assets of the Guarantee Fund of ANSES, which serves to guarantee the future payment of retirements, may be used in "public credit transactions."  La Nacion had asked ANSES about the actual amount of assets in the Guarantee Fund, but had received no response.  The article also noted the ability of the Government to simply replace a maturing Treasury bill with another when the first matures.  An example was the Treasury bill placed with ANSES for 2.75 billion pesos in April 2008 for a one-year term, replacing the bill issued in December which matured in April.

II.     The New Legislation

On October 21, 2008, Argentina's president, Christina Fernandez de Kirchner, proposed a new law, entitled "Integrated Argentine Pension System."  It was passed by the Argentine House of Representatives on

-20-

November 7 and by the Senate on November 20. It went into effect on December 9, upon signature by the President and publication in the Official Gazette.

The new law terminates the existing dual-regime pension system and requires the transfer of all FJP assets managed by AFJPs under the private system into the public system. Specifically, these assets would be lodged in the Guarantee Fund of ANSES. Pensioners will no longer have property rights in private funds, but are to receive "defined benefits" upon retirement. The purpose as expressed in the preamble to the bill is that pension funds should not be subject to the swings of financial markets.

The new law carries over essentially the same provision contained in the 2007 ANSES law to the effect that the funds of ANSES shall only be used to make benefit payments. Law 26,222 art. 15. Article 8 of the Integrated Argentina Pension System law provides that the funds in the integrated system "may only be used for payment of benefits under the Integrated Argentina Pension System."

It has already been seen that the safeguard written into the ANSES legislation did not prevent ANSES funds from being used at the will of the Government for the benefit of the Government.

It is widely believed by knowledgeable commentators that the actual purpose of the new legislation is to allow the Government more direct

access to the FJP funds now existing and to the larger pool of funds to be

accumulated in the future in the integrated pension system.  Indeed, the

provision in the new law about investment of fund assets is remarkable in its

laxity.  Article 8 provides that "fund assets shall be invested according to the

criteria of adequate security and profitability, and <u>shall contribute to the</u>

<u>sustainable development of the real economy</u>, for the purpose of ensuring a

virtuous circle between economic growth and an increase in social security

funding and assets" (emphasis added).

In a press release of November 11, 2008, Amado Boudou, head of

ANSES, said that he, <u>together with the Treasury and Finance secretaries</u>,

would decide how the ANSES funds would be invested following nationalization

 of the private funds.

Roberto Lavagna, Argentina's former Minister of Economy, was

asked in an interview on October 31, 2008 how ANSES was currently using the

retirees' money.  He answered that it was for "financing the budget . . . . It's all

invested in public bonds."  He was further asked about the possibility that the

same thing would happen under the new law.  He answered as follows:

> The bill introduced by the executive branch
> has no guarantees.  The combination of a
> common pot and superpowers means that
> we won't know where the money is going.
> They say things will go smoothly.  But, I
> also remember a speech by Peron in 1974
> where he said: "The retirees' money isn't

> there." Where did it go? To the fiscal
> deficit.

A Dow Jones item of October 21, 2008 noted that the Republic's

current financial options are dwindling and that some economists see the

pension fund takeover as a last-ditch move by the Government to get its hands

on cash. Dow Jones quoted a Goldman Sachs estimate that the takeover

would cover about one-third of the Government's borrowing needs for the years

2009 to 2011.

An article in The Times (London) of October 23, 2008, stated that

analysts believe that the new legislation is an attempt to seize assets and avoid

Argentina's second default this decade. According to the article,

> The last time that the Government sought to
> tap workers' savings to meet debt payments
> was in 2001, just before it stopped servicing
> £58 billion of obligations.

A Wall Street Journal article of October 28, 2008 stated that the

view of economists is that the takeover is aimed at replenishing the

Government coffers ahead of midterm elections and ahead of sizeable debt

payments coming due.

An item in La Nacion of November 7, 2008 stated that for Mr. and

Mrs. Kirchner "it's like a dream." La Nacion further remarked that the

Government coffers will be increased by almost 100,000 million pesos thanks

to the contribution which ANSES is going to receive from the private pension

-23-

funds.

On December 5, President Kirchner announced a plan to assist the Argentine economy by encouraging production, investment, employment, and consumption.  Of the funds needed, 7.5 billion pesos would come from fixed-term placements that the AFJPs had and that now will be managed by ANSES.

A further point should be noted with respect to the concern voiced by plaintiffs that assets of the various pension funds are likely to be removed from the United States and transferred to Argentina.  A Dow Jones item of October 28, 2008 quotes Amado Boudou as stating that foreign investments currently held by private pension funds would be sold and repatriated "to fulfill domestic finance objectives under a Government plan to nationalize the private funds."

III.   Assets in New York

Officials from two of the AFJPs stated in their declarations that the funds they administer lodged in New York are primarily used for investments, although they are occasionally reallocated between cash and securities in order to benefit from market fluctuations.  At the hearing of November 14, the attorney for certain of the AFJPs stated that about $200 million is currently frozen in accounts in New York.  When asked by the court whether these funds are in investment accounts or cash accounts, the attorney replied that they are mainly in investment accounts, although he did not know the details of such

accounts.  The assets actually belong to the FJPs, although they are administered by the AFJPs.

ANSES has filed a declaration stating that it does not have or hold any property in the United States, including any bank account.  Whether this declaration is intended to exclude investment accounts is not entirely clear.  Of course, now that the FJP assets are transferred to ANSES pursuant to the new legislation, ANSES will have ownership of the investment accounts in New York now belonging to the FJPs.

## Discussion

### The Status of ANSES

In connection with the issuance of the Argentine bonds, the Republic agreed to a broad waiver of sovereign immunity.  This waiver permitted the various lawsuits against the Republic in this court, based upon the defaulted bonds.  However, despite this broad waiver of immunity, when it comes to attachment of assets or execution on assets, there are limitations in the Foreign Sovereign Immunities Act ("FSIA") which must be observed.  The assets of a foreign state can be subject to such processes only if such assets are "used for a commercial activity in the United States."  28 U.S.C. §§ 1610(a) and (d).  See EM Ltd. v. Republic of Argentina, 473 F.3d 463, 468, 485 n.22 (2d Cir. 2007).  The statute obviously recognizes that even a waiver of sovereign immunity must have its limits.  For instance, there can be no attachment or

-25-

execution as to an embassy or a visiting naval vessel.

The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." § 1603(a). However, with respect to attachment and execution there are somewhat different provisions regarding what is referred to as a "foreign state" and what is referred to as "an agency or instrumentality of a foreign state." § 1610. There can be attachment or execution against the "foreign state" if there has been a waiver of immunity applicable to the state. §§ 1610(a) and (d). And there has in fact been such a waiver of immunity by the Republic of Argentina. As to an "agency or instrumentality of a foreign state" there must be a waiver of immunity specifically as to such agency or instrumentality, or another reason why immunity does not apply specifically to the agency or instrumentality. § 1610(b). There has been no such grant of immunity as to ANSES.

Plaintiffs contend, however, that ANSES is part of the foreign state of Argentina, that the immunity conferred by the Republic of Argentina embraces ANSES, and that property of ANSES can be attached and executed upon as belonging to the Republic. Plaintiffs deny that ANSES is an agency or instrumentality of the Republic, within the meaning of the FSIA, and deny that § 1610(b) has any application to ANSES.

The Republic and ANSES assert that ANSES is not part of the

Republic for the purpose of dealing with the issues here presented.  They claim that ANSES is a separate instrumentality over which the court has no jurisdiction, and they deny that jurisdiction over the Republic, and the immunity granted by the Republic, confers any jurisdiction or confers any basis under the FSIA to attach or execute upon the property of ANSES.

Plaintiffs do not contend that the FJP Funds or their managers, the AFJPs, are part of the Republic of Argentina.  They contend, however, that the Republic has rights to the FJP Funds which can be attached and executed upon pursuant to New York law.  This issue will be dealt with in a subsequent section of the opinion.

With regard to the issue of whether the process against ANSES is valid, the Republic and ANSES basically rest their position on the decision of the Supreme Court in First National City Bank v. Bancec, 462 U.S. 611 (1983). The first thing to note, however, is that Bancec was not a case under the FSIA. The issue in that case was whether a Cuban bank, which was an "instrumentality" of the Cuban government, could be held responsible for certain liabilities of the Cuban government.  The Court held the bank liable, in a factual setting having nothing whatever to do with the present case involving the Republic of Argentina.  The Court stated that the case was being decided under "principles of equity common to international law and federal common law." Id. at 613.  The Court stated that the FSIA did not control, but the Court

-27-

would be "guided by the policies articulated by Congress in enacting the FSIA."

Id. at 621.

The Court found, in the legislative history of the FSIA, an intention

of Congress that "duly created instrumentalities of a foreign state are to be

accorded a presumption of independent status." Id. at 627-28.  However, this

presumption may be overcome in certain circumstances, and the Court found

that it was indeed overcome in Bancec.

In the course of its discussion, the Court described characteristics

of a "typical government instrumentality, if one can be said to exist." Id. at

624.  One such characteristic is that the instrumentality "is primarily

responsible for its own finances" and is "run as a distinct economic enterprise."

Id.

Before discussing Bancec further, it is necessary to describe Garb

v. Republic of Poland, 440 F.3d 579 (2d Cir. 2006), which is the authoritative

ruling of the Second Circuit on the meaning of "agency or instrumentality"

under the FSIA. It is surely clear that the present case deals with matters

specifically covered by the FSIA - i.e., whether there can be attachment or

execution as to the property of a foreign sovereign and an entity connected with

that sovereign.  The Second Circuit in Garb concluded that when Congress

referred to agencies or instrumentalities in the FSIA, it was intending to target

"public commercial enterprises." Id. at 595.  The issue as to whether a foreign

entity is a "separate legal person" - i.e., separate from a foreign state - depends on whether the "core functions of the foreign entity are predominantly governmental or commercial." Id. at 591, 593-95. The court disapproved the idea of relying mechanically on the legal status of the foreign entity, or giving dispositive weight to whether the foreign entity could sue or be sued in its own name, contract in its own name, or hold property in its name. Id. at 595. Rather, the issue is, what function does the entity perform?

The Second Circuit cited with approval cases in the D.C. Circuit and the Fifth Circuit as to the governmental versus commercial distinction. Transaero, Inc. v. La Fuerza Aerea Bolivania, 30 F.3d 148 (D.C. Cir. 1994); Magness v. Russian Federation, 247 F.3d 609 (5th Cir. 2001). The Second Circuit found Transaero particularly instructive because the court in that case had analyzed Congress's use of the phrase "agency or instrumentality of a foreign state" in light of a "rich background of federal and international law." Garb, at 591.

It is now necessary to apply the Bancec and Garb decisions to the present case. The Second Circuit has recognized that the Bancec decision may be of little help in deciding FSIA cases. Compagnie Noga d'Importation et d'Exportation v. Russian Federation, 361 F.3d 676, 685 (2d Cir. 2004). In any event, however, the presumption of independence, described in Bancec, has surely been overcome in the present case. The Bancec decision mentioned that

a typical independent instrumentality is primarily responsible for its own financing and is run as a distinct economic enterprise.  The evidence before the court in the present case leaves no doubt about the fact that the Argentine Government dominates the finances of ANSES and uses ANSES at will in order to obtain funds for non-pension uses by the Government.

With regard to Garb, there is no difficulty in concluding that ANSES performs a governmental function rather than a commercial function. Indeed, ANSES admits, as it must, that the provision of social security is a governmental function.  The only argument of ANSES to avoid the Garb ruling is to assert that the test is whether the function must be governmental. ANSES contends that social security can be provided by an entity outside the government, as evidenced by the FJPs.  But the argument of ANSES finds no support in Garb or in similar decisions.  The issue is whether ANSES does in fact perform a governmental function, and it surely does.

The court holds that ANSES is a political subdivision of the Republic of Argentina, that it is subject to the jurisdiction of this court because the court has jurisdiction over the Republic, and that the assets of ANSES are subject to attachment and execution to the same degree as are the assets of the Republic.

Status of FJPs and AFJPs

At the time of the orders issued by the court, the FJPs and AFJPs

were entities separate from the Government of Argentina.  To the extent that

they still exist, even after transfer of the FJP assets to ANSES under the new

law, they are still separate entities.  Nor are they agencies or instrumentalities

of the Republic within the meaning of the FSIA.  The FJPs were established as

private pension funds and the AFJPs were established to administer these

private pension funds.  The court does not construe the arguments of plaintiffs

to present anything different.

The basis for attaching, executing upon, or restraining assets of

the FJPs is that the Republic has an interest in such assets which can make

such assets subject to attachment, execution, or restraint.  The authority for

such process lies in the fact that the Republic's interest in these assets is

subject to attachment under the FSIA (on the basis of explanations throughout

this opinion) and is subject to process under New York law (as will be explained

hereafter).

The AFJPs argue that, in order for plaintiffs to prevail in

connection with the FJP assets, they must overcome the <u>Bancec</u> presumption

that the FJPs are instrumentalities separate from the Republic of Argentina.

This argument is entirely misplaced.  No one is questioning the status of the

FJPs, and of the AFJPs, as separate entities.

Commercial Activity Requirement

In order to justify attaching or executing on property of a foreign

sovereign in the United States, plaintiffs must establish that the property is "used for a commercial activity in the United States." 28 U.S.C. §§ 1610(a) and (d).

In any event, both the Republic and ANSES argue that, even if all other conditions for attachment and execution are met for the investment accounts, such process is barred because the property is not used for commercial activity.  It should be noted that the Memoranda of Law filed on behalf of the AFJPs pose a variety of objections to the orders that have been entered, but do not discuss the commercial activity issue.

Plaintiffs argue that the commercial activity requirement is met because investment in securities is commercial activity and that this is true even if the assets might <u>ultimately</u> be used for some governmental activity, including payment of pensions in Argentina.  The Republic and ANSES contend that the ultimate governmental usage controls and that the funds in the United States are devoted to funding pensions.  Of course, while the FJPs are private pension funds, they are not part of the Government.  Nevertheless the payment

sovereign in the United States, plaintiffs must establish that the property is "used for a commercial activity in the United States." 28 U.S.C. §§ 1610(a) and (d).

As described earlier, the evidence shows that the FJPs have about $200 million of assets in New York, mainly in investment accounts, for investment in securities.   ANSES asserts that it has no property in the United States.  Presumably this denial means that it has no investment accounts, although the matter is not entirely clear.

In any event, both the Republic and ANSES argue that, even if all other conditions for attachment and execution are met for the investment accounts, such process is barred because the property is not used for commercial activity.  It should be noted that the Memoranda of Law filed on behalf of the AFJPs pose a variety of objections to the orders that have been entered, but do not discuss the commercial activity issue.

Plaintiffs argue that the commercial activity requirement is met because investment in securities is commercial activity and that this is true even if the assets might <u>ultimately</u> be used for some governmental activity, including payment of pensions in Argentina.  The Republic and ANSES contend that the ultimate governmental usage controls and that the funds in the United States are devoted to funding pensions.  Of course, while the FJPs are private pension funds, they are not part of the Government.  Nevertheless the payment

of pensions is something that is required under the Argentine Constitution and under Argentine law, and this is not commercial activity.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The basic inquiry in determining whether an activity is "commercial" is "whether the activity is of the type an individual would customarily carry on for profit." De Letelier v. Republic of Chile, 748 F.2d 790, 797 (2d Cir. 1984). Thus, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial.'" Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992). The FSIA specifies that a court consider this question "by reference to the nature of the course of conduct . . . , rather than by reference to its purpose." 28 U.S.C. § 1603(d).

Courts have recognized that sovereigns engage in commercial activity when they issue bonds or make contracts to purchase goods, even if the sovereign ultimately intends to use the proceeds of these activities for governmental purposes. See Weltover, 504 U.S. at 617 (issuance of bonds); Texas Trading & Milling Corp. v. Fed. Republic of Nig., 647 F.2d 300, 310 (2d Cir. 1981) (purchase of goods). Similarly, the legislative history of the FSIA states that investing in securities is commercial activity. H.R. Rep. No. 94-1487, at 16 (1976) (investment in a security of an American corporation is

-33-

included within the definition of commercial activity).  By contrast, repaying

debts to the International Monetary Fund, and, not surprisingly, conducting

political assassination, are not commercial activities.  EM Ltd., 473 F.3d at

484; De Letelier, 748 F.2d at 797.

   The Republic and ANSES urge the court to ignore Weltover and

certain other cases relied on by plaintiffs, because they were decided under

§ 1605, dealing with jurisdictional immunity, and not under § 1610, dealing

with attachments and executions.  However, the essential phrase in both

sections is "commercial activity."  The definition section of the statute, in

defining "commercial activity," does not provide any different definition for

§ 1605 versus § 1610.  See § 1603(d).  Courts have therefore applied decisions

concerning immunity under § 1605 to construe the scope of "commercial

activity" under § 1610.  E.g., De Letelier, 748 F.2d at 797.

   The Republic and ANSES contend that the use of the funds at

issue in the United States is analogous to funds held by sovereigns in U.S.

bank accounts for payment of diplomatic expenses.  This is not an accurate

analogy.  There is no indication that the funds at issue in the present case

have been subject to continuous deposits and withdrawals for the purpose of

actually paying pension benefits or any other governmental expenses.  If this

were the case, the court would surely have been informed of it.  The only

reasonable conclusion from the present record is that the funds are being

invested in the hope of profit in the manner that any investor would so invest.

The court must note that, while the actual current use of the funds for investment is a definite, known use, the "ultimate" use of the funds is a matter of doubt. The evidence described earlier in this opinion demonstrates that funds belonging to the FJPs and managed by the AFJPs might or might not be used for pensions. Such funds can be called upon at the will of the Government for "investment" in government securities, which in all probability is a form of appropriation for non-pension governmental uses.

The court concludes that any funds of the FJPs deposited in New York, and any funds of ANSES that may be deposited in New York, are used for commercial activity within the meaning of 28 U.S.C. §§ 1610(a) and (d).

New York Procedure

Under the Federal Rules of Civil Procedure, a federal court employs the attachment and execution procedures provided by the law of the state in which the court is located. See Fed. R. Civ. P. 64 (attachments); Fed. R. Civ. P. 69 (judgment executions). The New York Civil Practice Law and Rules ("CPLR") must be looked to in the present case.

CPLR §§ 6201 et. seq. deal with pre-judgment attachments. CPLR § 5101 et. seq. deal with post-judgment remedies. The provision regarding property subject to attachment, § 6202(b), refers to the definition used for enforcement of a judgment in § 5201. The result is that property subject to

attachment and property subject to execution are defined as:

> . . . any property which could be assigned or
> transferred, whether it consists of a present
> or future right or interest an whether or not
> it is vested. . . .

See § 5201(b).

The restraining notice, provided for in CPLR § 5222, is another post-judgment remedy, and clearly relates to property as defined in § 5201.

New York courts have recognized that a future, non-vested interest is attachable property under section 5201(b).  In ABKCO Industries, Inc. v. Apple Films, Inc., 39 N.Y.2d 670, 674 (1976), the New York Court of Appeals held that the plaintiff's contractual interest in a portion of the proceeds from a film project was attachable property, even though the defendant had not yet received any funds under the contract.  Thus, a court may attach "contingent property interests," such as payments that a debtor expects to receive from a trust, even when the payments are in the discretion of the trustee.  Kates v. Marine Midland Bank, N/A, 541 N.Y.S.2d 925, 928 (N.Y. Sup. Ct. 1989).  Moreover, even if the debtor's interest has no economic value at the time of the attachment, it can be attached as long as it "has potential economic value to the creditor."  Supreme Merchandise Co. v. Chemical Bank, 70 N.Y.2d 344, 349-50 (1987).

At the time the court signed the orders in the present proceeding, the Republic had property interests in the $200 million of FJP assets deposited

in New York within the meaning of New York law.  As shown earlier in this opinion, the Argentine Government had in effect exercised the power to "assign" and to "transfer" to itself very substantial portions of the assets of the FJPs for non-pension uses.  Therefore the Republic had interests in the FJP assets subject to attachment, execution, and restraint under the provisions of the CPLR and the case law interpreting such provisions.

The Republic and the AFJPs argue that if a debtor's possession of assets depends on further action by the debtor, the assets are not attachable property.  This argument rests on two lines of cases.  First, courts have rejected attempts in divorce cases to attach a spouse's potential future payments under an employer retirement plan when, at the time of the attachment, the spouse "would be entitled to no payment from the trustees of the Plan."  Sochor v. Int'l Bus. Machs. Corp., 60 N.Y.2d 254, 259-60 (1983); accord Price v. Palagonia, 212 A.D.2d 765 (2d Dep't. 1995).  Second, in Supreme Merchandise Co. v. Chemical Bank, supra, at 351, the New York Court of Appeals rejected an attempt to attach an interest under a negotiable letter of credit because the "unique character" of letters of credit in facilitating international trade presents "policy reasons" for preventing their attachment.  The court was concerned that allowing attachment of obligations under letters of credit would cause the "diminution of confidence in the certainty and integrity of letters of credit in this jurisdiction."  Id. at 353.  See also Diakan

<u>Love, S.A. v. Al-Haddad Bros. Enters.</u>, 584 F. Supp. 782, 785 (S.D.N.Y. 1984) (basing its decision on the "special role and nature of the letter of credit").

Both sets of cases apply to narrow factual settings that are not relevant here. The pension plan cases stand for the unremarkable principle that if a debtor has no interest in property, there is no interest to attach.  The policy concerns implicated by letters of credit do not apply to the attachment of investment accounts.  Moreover, the New York Court of Appeals has held that "even claims that depend on further action by the debtor may constitute 'property.'" <u>Supreme Merchandise</u> at 351.  At most, the Court of Appeals has suggested that courts should exercise caution when a debtor "retains the option to defeat [its] interest and render it worthless," since the debtor would be able to undermine the attachment under those circumstances.  <u>Id.</u> at 350-51.  The decisions do not bar the orders in this case.

The Republic of Argentina, ANSES and the AFJPs make an argument under CPLR § 5225(b).  This provides that where there is post-judgment execution upon property in the possession or custody of the judgment debtor, there must be a special proceeding against the third party in order to obtain the turnover of the property.  There is also an argument that there must be a special proceeding because plaintiffs are asserting alter ego theories.  The short answer to these contentions is that the current proceedings are not seeking a turnover, and plaintiffs are not relying on alter

ego theories.  Also, as can be seen from the rulings of the court in this opinion, the court has in no sense relied on the theory of alter ego.

As described earlier in this opinion, it appears that Argentine law provides that pension fund assets cannot be attached.  But the pension fund protections, written into Argentine law, have been manipulated by the Government with the result that the Government has exercised virtually unrestricted latitude to channel pension fund assets into Government accounts for non-pension use.  The Argentine prohibitions against attachment were obviously enacted with no reference whatever to a problem about attaching, executing upon, and restraining the <u>Government's</u> "interest" in the assets based on conduct by Government of the kind shown in this case.  The Argentine prohibitions cannot be said to bar the forms of process being used in the present case.

To return to the question of whether the FJP assets can be attached, executed upon, or restrained, the status of the FJP assets is now changed under the new law, which became effective December 9.  These assets are now the assets of ANSES.  All further proceedings to carry out attachment and post-judgment remedies will be directed against ANSES.  This puts the situation in a straightforward posture.  ANSES is part of the Government of Argentina.  The court has the direct authority to attach, execute upon, and restrain property in New York belonging to the Republic, which includes

property of ANSES.  This is true, provided that the requirements of the FSIA are met, as they are, for reasons that have been explained.

<u>Conclusion</u>

The court holds that the various forms of process described in this opinion, which were authorized as to the FJP Funds located in New York and any ANSES property located in New York, were legally valid at the time they were ordered by the court and remain legally valid, for the reasons set forth in this opinion.  The process as to FJP Funds remains in effect now that the assets of these funds are transferred to ANSES pursuant to the new law.

This holding is based on the record now before the court.  It appears that more discovery will take place, resulting in further development of the facts.  This may make additional rulings of the court necessary.  However, the court deemed it essential to issue an opinion now on the basis of the present record, and it is doing so.

Plaintiffs are directed to submit, on notice, proposed orders

specifically dealing with the various motions which have been made. [3]

     SO ORDERED.

Dated:     New York, New York
             December 11, 2008

                                   THOMAS P. GRIESA
                                     U.S.D.J.

---

[3] On November 24, 2008 the court signed ex parte orders regarding execution, attachment and restraint in the 10 cases brought by NML Capital and EM.  These were directed to assets which would be transferred to ANSES when the new law became effective.  The court is informed that, now that the new law is in effect, appropriate service of this process has been made. Although the present opinion may well have implications regarding the new NML Capital and EM proceedings, such proceedings are not before the court and are not covered by the ruling in the present opinion.  Moreover, nothing in the present opinion is intended to deal in any way with questions of priority among the plaintiffs.