Unreported Disposition
Slip Copy, 34 Misc.3d 1209(A), 2012 WL 89823 (Table), 2012 N.Y. Slip Op. 50023(U)

**This opinion is uncorrected and will not be published in the printed Official Reports.**

Global Technology, Inc., Petitioner,
v.
Royal Bank of Canada, Respondent.

150151/2011
Supreme Court, New York County
Decided on January 11, 2012

CITE TITLE AS: Global Tech.,
Inc. v Royal Bank of Can.

### ABSTRACT

Attachment
Bank Accounts

*Global Tech., Inc. v Royal Bank of Can.*, 2012 NY Slip Op 50023(U). Attachment—Bank Accounts. Civil Practice Law and Rules—§ 5227 (Enforcement of money judgments; payment of debts owed to judgment debtor). (Sup Ct, NY County, Jan. 11, 2012, Stallman, J.)

### APPEARANCES OF COUNSEL

Peter M. Agulnick, P.C., New York City (Peter Agulnick, Esq.), for Global Technology, Inc., petitioner.
Wilk Auslander LLP , New York City (Natalie Shkolnik and Julie Cilia, Esqs.), for Royal Bank of Canada, respondent.

### OPINION OF THE COURT

Michael D. Stallman, J.

In this special proceeding, a judgment creditor claims that a bank violated a restraining notice that prohibited transfers out a bank account of a judgment debtor. The bank was served with the restraining notice at a branch in New York, but the bank account of the judgment debtor was apparently maintained and accessible by the judgment debtor only in Canada. The bank relies on the "separate entity rule," precedent that recognized bank branches as separate legal entities for purposes of attachment and garnishment; the judgment creditor asserts that the rule is no longer good law. Federal courts are deeply divided from New York trial-level courts on this issue.

### BACKGROUND

According to the petition, petitioner Global Technology obtained a judgment dated August 17, 2009 from the United States District Court for the Eastern District of Michigan rendered against non-party Moto Diesel Mexicana (Moto) for $1,797,742.34. (Verified Petition, Ex A.) Petitioner registered the judgment with the United States District Court for the Southern District of New York, which then issued a transcript of judgment No. 10-0866, which was filed with the County Clerk of New York County on June 22, 2010. (*Id*., Ex B.)

On July 15, 2010, petitioner's counsel allegedly served an information subpoena with a restraining notice, by certified mail, return receipt requested, upon respondent Royal Bank of Canada ***2** at a branch in Manhattan. (*Id*., Ex C.) Respondent allegedly received the information subpoena with a restraining notice on July 19, 2010. (*Id*.) According to respondent, Moto had opened two accounts with respondent in Toronto, Ontario in February 23, 2009 (*see* Skolnik Affirm., Ex 3), only one of which had funds as of July 19, 2010. (*See id*., Exs 4-6.)

Petitioner's counsel allegedly emailed counsel for RBC Law Group on August 17, 2010, which attached "a copy of the New York Law Journal article that I discussed with you concerning foreign banks that have an office in New York State." (*Id*., Ex A.) Counsel allegedly replied to the email, "[P]lease be advised that: $84,292.46 is being held pursuant to the Restraining Notice." (*Id*.) An individual from RBC Law Group purportedly stated in a voicemail message to petitioner's counsel that Moto's funds had been frozen. (*Id*., Ex B.)

On October 17, 2010, petitioner commenced a turnover proceeding in Supreme Court, New York County against respondent, *Global Technology, Inc. v Royal Bank of Canada*, Index No. 651536/2010. (Shkolnik Affirm., Ex 8.) Respondent answered the petition stating that it had no objection to the prayer for relief, to the extent that petitioner sought a judgment directing respondent to turn over to petitioner all money or property belonging to Moto that was in respondent's possession. (*Id*., Ex 9.) By judgment dated April 5, 2011, the court (James, J.) directed respondent, among other things, to send a check to petitioner's counsel "within

7 business consisting of all money/property being held by Royal Bank of Canada that belongs to Judgment Debtor Moto Diesel Mexicana." (*Id.*, Ex 10.) According to respondent, a check in the amount of $214,860.06 was sent on April 12, 2011. (*Id.*, Ex 11.)

On May 17, 2011, petitioner commenced this special proceeding against respondent, alleging that respondent failed to abide by the restraining notice served in July 2010. According to petitioner, respondent willfully or negligently allowed Moto to withdraw $921,091.47 from Moto's bank account with RBC during the period of July 19, 2010 to August 4, 2010, in violation of the restraining notice. (Verified Petition ¶ 13.) As of the date of the commencement of this proceeding, petitioner alleges that the unsatisfied balance of petitioner's judgment against Moto was $323,242.72. (*Id.* ¶ 15.)

Accordingly, pursuant to CPLR 5251, 5222, and 5227, petitioner seeks a judgment against respondent in the unsatisfied balance of the judgment, plus attorneys' fees, and a finding of contempt against respondent with an award of damages and attorneys' fees.

Respondent moves and cross-moves to dismiss the petition. It is undisputed that, at some point after commencement of this proceeding, the underlying judgment was satisfied. Respondent therefore argues that the proceeding should be dismissed as moot and seeks an order compelling petitioner to file a satisfaction piece pursuant to CPLR 5020.

Respondent also argues, among other things, that the restraining notice served upon respondent's branch in Manhattan was not effective to restrain Moto's Toronto bank account, because Moto's bank account at issue was allegedly opened in Canada, maintained in Canada only, and could not be accessed in the United States. [1]

***3* I.**
"[V]iolation of the restraining notice by the party served is punishable by contempt (CPLR 5222, subd [a]; 5251) and subjects the garnishee to personal liability in a separate plenary action or a special proceeding under CPLR article 52 brought by the aggrieved judgment creditor." (*Aspen Indus. v Marine Midland Bank,* 52 NY2d 575, 580 [1981].) In contrast, when a money judgment is sought for the violation, rather than contempt, " there is no willfulness requirement for imposition of money damages, [but] there must at least be a showing of negligence in failing to comply with the restraining notice." (*Security Trust Co. of Rochester v Magar Homes,,* 92 AD2d 714, 714 [4th Dept 1983]; *see also* Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5222:10 ["The availability of a simple money action as an alternative to the contempt penalty, and with mere negligence as its permissible predicate, seems to avoid the issue [of determining willfulness]".)

Here, whether respondent violated the restraining notice served upon its branch in Manhattan depends on whether the "separate entity rule" remains good law in light of the Court of Appeals's decision in *Koehler v Bank of Bermuda Ltd.* (12 NY3d 533 [2009].) To determine *Koehler*'s impact, if any, upon the separate entity rule, the Court must first examine the separate entity rule and the circumstances under which the rule applied pre-*Koehler*.

**A.**
It was previously well-settled that "[t]he general rule in New York is that in order to reach a particular bank account the judgment creditor must serve the office of the bank where the account is maintained." (*Therm-X-Chemical & Oil Corp. v Extebank,* 84 AD2d 787 [1st Dept 1981].) "The theory of these decisions is that for purposes of attachment, among others, each branch of a bank is a separate entity, in no way concerned with accounts maintained by depositors in other branches or at the home office." (*Cronan v Schilling,* 100 NYS2d 474, 476 [Sup Ct, NY County 1950], *affd* 282 AD 940 [1st Dept 1953].) "The separate entity rule was historically justified on the basis of both the impracticability of requiring constant transmission of reports on the status of accounts in one branch to all other branches, and on the recognition that any banking operation in a foreign country is necessarily subject to the foreign sovereign's own laws and regulations . . . '" (Healey & Marris, *New York Court Determines That Banks Still Have the Protection of the "Separate Entity" Doctrine after Koehler,* 128 Banking LJ 668, 669 [2011].) Thus, it was generally understood that, under the separate entity rule, a judgment creditor had to direct service of the order of attachment or restraining notice to the bank branch where the account is maintained for that account to be restrained.

In *Digitrex, Inc. v Johnson* (491 F Supp 66 [SD NY 1980]), a federal court held that the separate entity rule was no longer valid, given technological advances and improvements in communication and record keeping by banks. The court "h[e]ld that service of the restraining notice in the case at bar on Manufacturers Hanover's main office was sufficient

and legally effective" to restrain assets at the particular bank branch where the account was maintained. (*Id.* at 69.) However, another federal court stated, "New York decisions since *Digitrex* have determined the validity of the service of restraining notices and subpoenas on a case by case basis in relation to a bank's existing computer operations and the burden imposed by compliance."' (*Limonium Maritime,* **\*4** *S.A. v Mizushima Marinera*, 961 F Supp 600, 607 [SD NY 1997][collecting cases].) *Therm-X-Chemical & Oil Corp. v Extebank* (84 AD2d 787, *supra*) limited *Digitrex* "by requiring that the old rule be followed where the main office of the bank does not have high speed computers with central indexing capabilities to keep track of its depositors' accounts."' (*S & S Machinery Corp. v Manufacturers Hanover Trust Co.,* 219 AD2d 249, 252 [1st Dept 1996] [citation omitted].)Thus, in a practice commentary to CPLR 5222 (b), Professor David D. Siegel stated,

"If the property pursued by the judgment creditor is a bank account maintained by the judgment debtor, the creditor is best off by serving the restraint on the branch in which the account is kept. For enforcement purposes, a bank account is always deemed property of the judgment debtor at that branch regardless of how many other branches the bank may maintain, even though, at least with computerized banks, service of the restraining notice at the home office may suffice."

(Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5222:5.)

### B.

"A corollary to the separate entity rule is the equally well established proposition that a New York Court cannot attach property that is outside of its jurisdiction."' (*Koehler v Bank of Bermuda Ltd.,* 2004 WL 1555116, \*4 [SD NY 2004]; citing *Lok Prakashan Ltd. v Indian Abroad Publ., Inc.*, 2002 WL 1585820 [SD NY 2002]; *see also Intercontinental Credit Corp. Div. of Pan Am. Trade Dev. Corp. v Roth*, 152 Misc2d 751, 752 [Sup Ct, NY County 1990]["It is true . . . that a New York court cannot attach property not within its jurisdiction"], *vacated in part* 154 Misc2d 639 [Sup Ct, NY County 1991].[2]) The corollary to the separate entity rule can be understood as a rule derived from the application of the separate entity rule.

Under the separate entity rule, a bank branch in New York is regarded as if it were a separate corporate entity from a bank branch in Germany-- as if the two bank branches were different banks altogether--for the purposes of attachment and garnishment. Therefore, service of a restraining notice upon the New York branch does not restrain any accounts held by the bank branch in Germany. By applying the separate entity rule, the result is that a restraining notice served upon a bank in New York cannot reach property held by the bank that is located outside of the State of New York. Application of the separate entity rule thereby evolved into a free standing rule, the so-called "corollary," that New York cannot reach property held in a bank account that is located outside of the State of New York. The free standing corollary to the separate entity rule resembled a rule of jurisdiction governing attachments of property.[3] The separate entity rule thereby lost its connection **\*5** to its origin in concerns about the relationship of bank offices, especially those out of state.

Cases applying the corollary to the separate entity rule cite the Court of Appeals's decision in *McCloskey v Chase Manhattan Bank* (11 NY2d 936 [1962].) In *McCloskey*, the Sheriff of the City of New York served a warrant of attachment upon a bank at an office in New York City, to levy on two bank accounts maintained by an individual in a bank branch in Germany. The bank refused to pay over the funds to the Sheriff. The Sheriff and others brought an action against the bank, but the Supreme Court granted the bank's motion to dismiss the action. The Appellate Division, First Department and the Court of Appeals affirmed the decision without opinion. (*McCloskey v Chase Manhattan Bank,* 14 AD2d 768 [1st Dept 1961], *affd without opinion*, 11 NY3d 936, *supra*).[4] Application of the corollary to the separate entity rule was consistent with the result reached in *McCloskey*, in that an attachment served upon a bank branch in New York did not attach a bank account located outside the State of New York.

### C.

It was generally understood that the separate entity rule applied to attachments and garnishments, because courts did not recognize bank branches as separate entities when an injunction was sought against a bank. (*See United States v First Natl. City Bank*, 379 US 378 [1965]; *Abuhamda v Abuhamda*, 236 AD2d 290, 290 [1st Dept 1997].)

In *United States v First National City Bank*, the United States, trying to collect taxes owed by a Uruguayan corporation, sought a preliminary injunction against a New York bank to freeze the assets of the Uruguayan company that were on deposit in the bank's branches in Montevideo, the capital

of Uruguay. The United States Supreme Court reversed the decision of the Court of Appeals for the Second Circuit, stating, in pertinent part:

"Whether the Montevideo branch is a separate entity,' as the Court of Appeals thought, is not germane to the present narrow issue. It is not a separate entity in the sense that it is insulated from respondent's managerial prerogatives. Respondent has actual, practical control over its branches; it is organized under a federal statute, **\*6** 12 U.S.C. § 24, which authorizes it To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons'--as one entity, not branch by branch. The branch bank's affairs are, therefore, as much within the reach of the *in personam* order entered by the District Court as are those of the home office. Once personal jurisdiction of a party is obtained, the District Court has authority to order it to freeze' property under its control, whether the property be within or without the United States."

(*US v First Natl. City Bank*, 379 US at 384.)

In *Abuhamda*, the plaintiff sued his father, who had transferred money in a bank account from a branch in New York to a branch in Amman, Jordan. The Appellate Division, First Department affirmed the lower court's preliminary injunction directing the bank, in effect, to freeze the account in Jordan. The Appellate Division, First Department held that the court properly directed a bank "which engages in business in this State and is clearly subject to its jurisdiction, to refrain from paying out funds that are currently in one of its accounts, albeit one not physically located in New York." (*Abuhamda*, 236 AD2d at 290.)

**D.**

In *Matter of National Union Fire Insurance Company of Pittsburgh, Pa. v Advanced Employment Concepts* (269 AD2d 101, *supra*), the Appellate Division, First Department was presented with the issue of whether the separate entity rule was no longer good law, in light of the *Digitrex*.[5]

In aid of arbitration, the petitioner brought a special proceeding for an order of attachment and a restraining order against the respondent, and both were granted without opposition in one long order, which ordered, among other things,

"that the Sheriff of the City of New York or the Sheriff of any Count of the State of New York levy within his or jurisdiction, at any time during the pendency of the Arbitration Proceedings, upon such property in which [respondent] has an interest and upon such debt owing to [respondent] as will satisfy an amount of the Petitioner's demand"

(*Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts*, Sup Ct, NY County, Aug. 10, 1998, Gans, J., index No. 113694/1998.) That order was served upon a bank in New York, which then restrained two of respondent's accounts held at a bank branch of that bank in Florida. The respondent cross-moved for a determination that its bank accounts in Florida were not subject to the order of attachment. The Supreme Court ruled that the two Florida bank accounts were not subject to the order of attachment, stating:

"In the matter *sub judice* petitioners are not seeking to reach funds maintained at a branch within this jurisdiction, but rather those outside this jurisdiction. Any attachment of those funds are subject to the laws of the situs jurisdiction. That NationsBanks may be subject to the jurisdiction of New York is insufficient to attach the Florida bank accounts. It is necessary that the property or debt to be subject to **\*7** attachment be amendable to the jurisdiction of this Court."

(*Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts*, Sup Ct, NY County, Nov. 17, 1998, Huff, J., index No. 113694/1998, at 4 [citations omitted].)

On appeal, the petitioner argued that the separate entity rule was obsolete, and that "because this Court has jurisdiction over Nationsbank [in New York], [respondent's] accounts at Nationsbank in any state are subject to the Order of Attachment." (Brief of Petitioners-Appellants in *Matter of National Union Fire Insurance Company of Pittsburgh, Pa. v Advanced Employment Concepts,* 269 AD2d 101, at 8.) That is, because the court had *in personam* jurisdiction over the bank, the petitioner argued that the out-of-state bank accounts were subject to the attachment. In effect, the petitioner sought to apply the law governing injunctions against a bank controlling out-of-state bank accounts to attachments served upon banks against out-of-state bank accounts.

The Appellate Division upheld the Supreme Court's order vacating the order of attachment as to the Florida bank

accounts, stating, "In order to be subject to attachment, property must be within the court's jurisdiction, and the mere fact that a bank may have a branch within New York is insufficient to render accounts outside of New York subject to attachment merely by serving a New York branch." (*Matter of National Union Fire Ins. Co. of Pittsburgh, Pa.*, 269 AD2d at 101 [citation omitted].)

The Appellate Division stated that petitioner's reliance upon *Digitrex* was misplaced:

"The holding of *Digitrex (supra)*, however, was clarified, and limited, by *Limonium Mar. v Mizushima Marinera* (961 F Supp 600), in which the court held that the exception to the separate entity rule is applicable only where the restraining notice is served on the bank's main office; the main office and the branches where the accounts in question are maintained are within the same jurisdiction; and the bank branches are connected to the main office by high-speed computers and are under its centralized control. [citation omitted]

In this matter, it is clear that the accounts which the petitioner seeks to attach are not in the same jurisdiction as the New York office that petitioner served. To the extent that the petitioner requests that we extend the holdings of *Digitrex* (*supra*) and *Limonium Mar.* (*supra*) to encompass all of a bank's branches, notwithstanding their physical location outside of this jurisdiction, we decline to do so and note that such an extension would require, in our view, a pronouncement from the Court of Appeals or an act of the Legislature."

(*Id.* at 102.)

The Appellate Division's application of the separate entity rule and its corollary was not new, but the Appellate Division's application of the rule as a question of whether it had jurisdiction over an account in a Florida bank branch is noteworthy. That is, the Appellate Division could have vacated the order of attachment and the restraining order because those orders were not served on the main bank branch, which rendered inapplicable the *Digitrex* exception to the separate entity rule. Nevertheless, the Appellate Division went further to rule, "[I]t is clear that the accounts which the petitioner seeks to attach are not in the same jurisdiction as the New York office that petitioner **\*8** served." (*Id.* at 102.)

In this context, "jurisdiction" seems to refer to territorial jurisdiction, i.e., the territorial boundaries of the State of New York, because the bank accounts to be restrained were not located in New York. However, "jurisdiction" could also be interpreted as meaning personal jurisdiction over the out-of-state account or bank branch. After all, the petitioner had argued on appeal that, because the court had *in personam* jurisdiction over the bank, the order of attachment could reach assets outside New York. That is, the holding in *Matter of National Union* is susceptible to the interpretation that, in light of the separate entity rule, personal jurisdiction over a bank's branch in the State of New York was not sufficient to confer personal jurisdiction over another branch located outside the state, even though the bank was doing business in State of New York, and thus present in the state. Such a view would effectively convert the separate entity rule into a rule of personal jurisdiction.

The Appellate Division seemed to clarify the meaning of "jurisdiction" later in *Gryphon Domestic VI, LLC v APP International Finance Company, B.V.* (41 AD3d 25, 39 [1st Dept 2008].)

E.

In *Gryphon Domestic VI, LLC*, the plaintiffs, described as institutional traders in distressed debt, purchased promissory notes that were issued by a Dutch corporation and guaranteed by an Indonesian corporation, secured by collateral located in Indonesia. After obtaining summary judgment on promissory notes against the issuer and guarantor of the notes in the Supreme Court, New York County, the plaintiffs served a restraining notice on each defendant. The plaintiffs then moved for a turnover order. The defendants cross-moved to vacate the restraining notices, contesting service.

Citing *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa.*, the Supreme Court vacated the restraining notices, reasoning, "The Restraining Notices against the Judgment Debtors were ineffective in any event because their property is located outside of New York, and restraining notices issued by this Court do not reach property in other jurisdictions." (*Gryphon Domestic VI, LLC v APP International Finance Company, B.V.*, 2005 WL 6345678 [Sup Ct, NY County 2005].) However, the Supreme Court rejected the defendants' argument that they were not subject to a turnover order, ruling, "inasmuch as the Court has obtained personal jurisdiction over the Judgment Debtors and the Judgment has been entered against them in this action, the Court can order them to satisfy it by delivering their property, regardless of its location." (*Id.*) Thus, the Supreme Court applied the corollary to the separate entity rule

to invalidate the restraining notices, but applied a different approach to the turnover order, which was consistent with case law on injunctions against banks controlling out-of-state bank accounts.

On appeal, the Appellate Division, First Department reversed the lower court's order, insofar as the order had vacated the restraining notices. The Appellate Division ruled that *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa.* did not stand for the proposition that New York courts cannot restrain transfers of property located outside of the state.

"Rather, in *National Union* we held that the court was without authority to attach bank accounts outside of New York . . . In order to be subject to *attachment*, property must be within the court's jurisdiction.' (*Id.* [emphasis added].) Moreover, this Court's decision in *Abuhamda* (236 AD2d at 290) demonstrates that a New York court *can* restrain transfers of property outside the state, so long as it has jurisdiction **\*9** over the transferor."

(*Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V.*, 41 AD3d 25, 39 [1st Dept 2008].) Thus, *Gryphon Domestic VI, LLC* clarified that "jurisdiction" in *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa.* did not refer to the territorial boundaries of the State of New York. That is, the fact that the bank account in *Matter of National Union Fire Ins. Co.* was considered not to be in the State of New York was not the reason why the Appellate Division ruled that the bank account was not within the court's jurisdiction.

The Appellate Division also ruled that the Supreme Court erred in vacating an injunction prohibiting the defendants from transferring assets into Indonesia. Citing *Abuhamda* (236 AD2d 290, *supra*), the Appellate Division stated, "The IAS court had the power to issue the injunction, even though it related to extraterritorial conduct, because it had jurisdiction over the defendants."

Thus, the Appellate Division applied *Abuhamda*, which involved a provisional remedy, to post-judgment enforcement mechanisms.

Commentators saw tensions in the law concerning the extraterritorial reach of a restraining notice, between the courts' "liberal approach to injunctions, which enable courts to restrict transfers of property, including property located outside the state" and the law "governing attachment and the related separate entity rule'. . ." (Bruce M. Sabados and Daniel A. Edelson, *The Reach of Restraining Notices; Unresolved issues over bank accounts located outside New York State*, NYLJ, Oct. 6, 2008, at S6, col 3.) Because *Gryphon Domestic VI, LLC* did not involve a bank, a question was left open as to whether the reasoning in *Abuhamda* applied to the territorial reach of post-judgment enforcement mechanisms against a bank. *Koehler v Bank of Bermuda Ltd.* (12 NY3d 533 [2009]) answers this question in the affirmative.

## II.

In *Koehler v Bank of Bermuda Ltd.* (12 NY3d 533, *supra*), Koehler obtained a default judgment in June 1993 for about $2 million against his former business partner, a resident of Bermuda who, at that time, owned stock in a Bermuda corporation, the certificates of which had been pledged as collateral to the Bank of Bermuda Ltd. In July and August 1993, Koehler attempted service of a writ of execution and a restraining notice on the Bank of Bermuda Ltd., by personally serving an officer of the Bank of Bermuda (New York), Ltd., a wholly owned New York subsidiary. (*Koehler v Bank of Bermuda, Ltd.*, 1994 WL 48825, \*1 [SD NY 1994]; *see also Koehler v Bank of Bermuda Ltd.,* 544 F3d 78, 80 [2d Cir 2008].)

In October 1993, Koehler filed a petition with the United States District Court for the Southern District of New York seeking payment or delivery of property of the judgment debtor pursuant to CPLR article 52. The Bank of Bermuda Ltd. moved to dismiss the proceeding on the grounds of lack of personal jurisdiction and improper service. The District Court denied the Bank of Bermuda Ltd.'s motion, finding that Koehler demonstrated that the Bank of Bermuda, Ltd. was "doing business" in New York through its wholly owned subsidiary. (*Id.* at \*5.) [6] Koehler obtained **\*10** a turnover order from the District Court, directing the Bank of Bermuda Ltd. to deliver the stock certificates, or monies sufficient to pay the judgment, to Koehler. (*Koehler,* 544 F3d at 81.) Despite the turnover order issued in 1993, the Bank of Bermuda Ltd. revealed in April 2004 that the stock certificates were no longer in its possession.

In 2005, the District Court denied the petition and a motion to amend the petition to add additional claims, concluding that "it had no in rem jurisdiction over [the judgment debtor's] share certificates, which underlies Koehler's remaining claims against BBL." (*Koehler v Bank of Bermuda Ltd.*, 2005 WL 551115, \*7 [SD NY 2005].) On appeal, the United States Court of Appeals for the Second Circuit certified a question

to the Court of Appeals of the State of New York: whether a court sitting in New York may order a bank over which it has personal jurisdiction to deliver stock certificates owned by a judgment debtor (or cash equal to their value) to a judgment creditor, pursuant to CPLR article 52, when those stock certificates are located outside New York.

By a 4-3 majority, the Court of Appeals held that "a court sitting in New York that has personal jurisdiction over a garnishee bank can order the bank to produce stock certificates located outside New York, pursuant to CPLR 5225 (b)." (*Koehler*, 12 NY3d at 541.) Citing *Gryphon Domestic VI, LLC* (41 AD3d 25, *supra*), the Court reasoned,

"the key to the reach of the turnover order is personal jurisdiction over a particular defendant. [A] turnover order merely directs a defendant, over whom the New York court has jurisdiction, to bring its own property into New York' (*Gryphon*, 41 AD3d at 31). A New York court has the authority to issue a turnover order pertaining to extraterritorial property, if it has personal jurisdiction over a judgment debtor in possession of the property. As long as the debtor is subject to the court's personal jurisdiction, a delivery order can be effective even when the property sought is outside the state.' (Siegel, NY Prac § 510, at 866 [4th ed])."

(*Koehler*, 12 NY3d at 540.)

Judges Smith, Read, and Jones dissented. In writing for the dissent, Justice Smith stated, "The majority's broad view of New York's garnishment remedy may cause it to exceed the limits placed on New York's jurisdiction by the Due Process Clause of the Federal Constitution." (*Id*. at 544.) Justice Smith commented, "The majority's holding opens a forum-shopping opportunity for any judgment creditor trying to reach an asset of any judgment debtor held by a bank (or other garnishee) anywhere in the world." (*Id*. at 542.) [7]

**A.**

*Koehler* did not involve the separate entity rule, because the entity served with the writ of execution was not a bank branch, but rather a wholly-owned New York subsidiary of the Bank of Bermuda Ltd., served through an officer of the New York subsidiary. The wholly-owned subsidiary existed as a separate corporate entity apart from the Bank of Bermuda Ltd. *Koehler* can be read *11 narrowly, inasmuch as the Court of Appeals answered only the question certified by the United States Court of Appeals for the Second Circuit, which did not ask about the separate entity rule. However, *Koehler* involved a bank and a turnover order, a post-judgment enforcement mechanism, and so the Clearing House Association L.L.C. was concerned that the Court of Appeals's decision might affect the separate entity rule. It had submitted an amicus brief in *Koehler*, asking that "The Court should not answer the certified question in a manner that conflicts with the separate entity rule." (*Koehler v Bank of Bermuda Ltd.*, 2009 WL 1615261, *18-21 [2009].)

On the one hand, because *Koehler* did not involve application of the separate entity rule, courts have rejected arguments that *Koehler* impliedly abrogated the separate entity rule in post-judgment enforcement proceedings. (*Samsun Logix Corp. v Bank of China*, 31 Misc 3d 1226 (A) [Sup Ct, NY County 2011][Solomon, J.]; *Parbulk II AS v Heritage Maritime SA*, 2011 WL 6181935 [Sup Ct, NY County 2011] [Sherwood, J.].)

On the other hand, *Koehler* definitively rejected the corollary to the separate entity rule--that a New York court was without authority to order post-judgment enforcement upon a bank's accounts outside of New York, even if the court had *in personam* jurisdiction over the bank. Commentators questioned whether the separate entity rule itself was still valid. (Daniel L. Brown and Elizabeth M. Rotenberg-Schwartz, *Judgment Secured: Now What?*, NYLJ, July 20, 2009 at S8, col 1.) "[U]nder Koehler, the separate entity rule appears to be irrelevant where a creditor serves process on a foreign bank and can argue that the bank is present' in New York for jurisdictional purposes." (*Id*.) Citing *Koehler*, one federal District Court ruled, "Because Bank of India is subject to general personal jurisdiction in New York, I conclude that the separate entity rule has no application here." (*Eitzen Bulk A/S v Bank of India*, 2011 WL 4639823, *6 [SD NY 2011].) Another federal District Court stated, "*Koehler* indicates that New York courts will not apply the separate entity rule in post-judgment execution proceedings." (*JW Oilfield Equipment, LLC v Commerzbank, AG* 764 F Supp 2d 587, 595 [SD NY 2011].) In these cases, the separate entity rule is seen as inconsistent with the spirit, if not the letter, of *Koehler*.

After *Koehler*, the Court of Appeals again revisited the question of the extraterritorial reach of a New York court in *Hotel 71 Mezz Lender LLC v Falor* (14 NY3d 303 [2010]), when it upheld the provisional remedy of an attachment issued on a nondomiciliary garnishee of a defendant's intangible personal property, i.e., ownership/membership

interests in out-of-state limited liability companies. The Court of Appeals stated,

"[W]hen attachment is used to serve as a jurisdictional predicate, the following black letter principle must be adhered to: where personal jurisdiction is lacking, a New York court cannot attach property not within its jurisdiction.' (*Id.*)

On the other hand, where a court acquires jurisdiction over the person of one who owns or controls property, it is equally well settled that the court[ ] can compel observance of its decrees by proceedings *in personam* against the owner within the jurisdiction' (*id.*) . . .

Based on the foregoing, a court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York. (*cf. Koehler,* 12 NY3d at 539.)"

(*Hotel 71 Mezz Lender LLC,* 14 NY3d at 311-312.) The Court of Appeals ruled that the Supreme *12 Court had the authority to grant an attachment of the property of a guarantor, who had "voluntarily submitted to the personal jurisdiction of the court by executing the personal guaranty." (*Id.*) The Court of Appeals also ruled that the situs of the intangible property interests was in New York. (*Id.* at 316.)

**B.**

Together, *Koehler* and *Hotel 71 Mezz Lender LLC* indicate that, as a matter of due process, the reach of post-judgment enforcement devices and provisional remedies to property outside the State of New York should be analyzed in the same way. However, as respondent indicates, *Koehler* and *Hotel 71 Mezz Lender LLC* did not involve restraining notices. [8] Neither was the separate entity rule involved in those cases. The nondomiciliary garnishee in *Hotel 71 Mezz Lender LLC* was not a bank. Moreover, *Gryphon Domestic VI, LLC,* (41 AD3d 25, *supra*) did not overrule *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa.*, which upheld the separate entity rule. It therefore follows that *Koehler*, which relied upon *Gryphon Domestic VI, LLC*, did not impliedly abrogate the separate entity rule.

If a state court has *in personam* jurisdiction over a party, that jurisdiction knows no territorial limitations. Yet, "[t]he strictures of the Due Process Clause forbid a state court to exercise personal jurisdiction over [a party] under circumstances that would offend traditional notions of fair play and substantial justice." (*Asahi Metal Industry Co., Ltd. v Superior Court of California, Solano County,* 480 US 102, 113 [1987] [internal quotation marks and citations omitted].) Permitting a restraining notice to restrain bank accounts anywhere in the world, by service upon any bank branch subject to *in personam* jurisdiction, could work a hardship upon individuals whose accounts were restrained.[9] For example, suppose a plaintiff obtains a default judgment over a defendant in New *13 York and the defendant, who resides in Texas and maintains a bank account in Texas, lacks minimum contacts with New York; that plaintiff's attorney then issues a restraining notice to the defendant's bank, which does business in New York, and serves it at a bank branch in New York. If the separate entity rule were abrogated, then the bank branch in New York would have to freeze the defendant's bank account in Texas. To vacate the default judgment upon which the restraining notice depends, the defendant would have no other recourse but to come to the very jurisdiction that lacked minimum contacts with the defendant.[10] If the bank account were a joint account, or to the extent that others could have competing claims to the bank account, the restraining notice could also work a hardship upon the rights of those who are innocent, out-of-state third parties. Such hardship would pose due process concerns under *International Shoe* and its progeny.

The separate entity rule did not develop from cases involving personal jurisdiction. The separate entity rule can be traced back to English law. (*United States v First Natl. City Bank,* 321 F2d 14, 19 [2d Cir 1963] [referencing English cases from 1857, 1927, and 1912], *revd* 379 US 378 [1965]). Thus, the separate entity rule developed well before the modern due process analysis of personal jurisdiction under *International Shoe Company v Washington* (326 US 310 [1945]) and its progeny. Modern technology may have obviated many of those historical concerns that gave rise to the separate entity rule; nevertheless, it cannot be said that strong policy arguments do not still exist for maintaining the rule, concerns which were highlighted before the Court of Appeals in *Koehler* but which were left unaddressed.[11] *14

The separate entity rule can be harmonized with the modern due process framework of personal jurisdiction, when the separate entity rule is understood as akin to a rule governing service of process. (*See John Wiley & Sons, Inc. v Kirtsaeng,* 2009 WL 3003242, *3 [SD NY 2009]*[" In New York, the separate entity rule' . . . limits the effect of Plaintiff's service in New York. "].) Just as *CPLR 311* provides that service

upon a corporation is properly made upon certain officers of a corporation, or that service upon the City of New York is properly made upon its Corporation Counsel (or any person designated to receive process), the separate entity rule requires that service of a post-judgment restraining notice upon a bank must be made upon the bank branch where the account is maintained. Viewed as a rule for service of post-judgment enforcement process, service of a restraining notice upon one bank branch (other than the main branch) would be improper, if the restraining notice sought to restrain an account that the served bank branch did not maintain, even if a basis for *in personam* jurisdiction over the bank was not in dispute.

Without a clear statement from the Appellate Divisions or the Court of Appeals, this Court therefore declines to abrogate the separate entity rule so as to hold that service of a restraining notice upon any bank branch in the State of New York encompasses all of a bank's branches, including those located outside the State of New York. [12] The Appellate Division, First Department has twice rejected arguments that the separate entity rule was abrogated. (*Therm-X-Chemical & Oil Corp. v Extebank*, 84 AD2d 787, *supra*; *Matter of National Union Fire Insurance Company of Pittsburgh, Pa. v Advanced Employment. Concepts*, 269 AD2d 101, *supra.*) The very argument that petitioner raises here was rejected in *Matter of National Union Fire Insurance Company of Pittsburgh, Pa.* (*See* Section I.D., *supra.*)

Therefore, under the separate entity rule, service of the petitioner's restraining notice upon respondent's branch in Manhattan did not restrain Moto's bank accounts in Canada.

### C.

Petitioner argues that respondent waived its right to claim that the restraining notice was ineffective because respondent informed petitioner's counsel that Moto's accounts were frozen.

"Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable. Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." (*General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.*, 85 NY2d 232, 236 [1995].) "A waiver is not **\*15** created by negligence, oversight, or thoughtlessness, and cannot be inferred from mere silence." (*Golfo v Kycia Assoc., Inc.*, 45 AD3d 531, 533 [2d Dept 2007][internal quotation marks and citation omitted].) "Such intention must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." (*Echostar Satellite L.L.C. v ESPN, Inc.*, 79 AD3d 614, 617 [1st Dept 2010][internal quotation marks and citations omitted].)

As discussed above, after *Koehler,* some federal cases ruled that *Koehler* abrogated the separate entity rule (*Eitzen Bulk A/S*, 2011 WL 4639823, *supra*; *JW Oilfield Equipment, LLC*, 764 F Supp 2d 587, *supra*), while two New York state courts rejected that interpretation (*Samsun Logix Corp.*, 31 Misc 3d 1226 (A), *supra*; *Parbulk II AS v Heritage Maritime SA*, 2011 WL 6181935, *supra.*) Other post-*Koehler* federal cases applied the separate entity rule but did not discuss *Koehler*. (*Allied Maritime Inc. v Descatrade SA*, 620 F3d 70, 74 [2d Cir 2010]; *Levin v Bank of New York*, 2011 WL 812032,*12, 2011 US Dist LEXIS 23779 [SD NY2011] ); *John Wiley & Sons, Inc. v Kirtsaeng*, 2009 WL 3003242, *4, 2009 US Dist LEXIS 86498 [SD NY 2009].) Citing *Koehler*, other federal cases ruled that post-judgment enforcement mechanisms served upon a bank had extraterritorial reach, without discussing the separate entity rule. (*McCarthy v Wachovia Bank, N.A.*, 759 F Supp 2d 265 [ED NY 2011]; *Calton v Pressler & Pressler, LLP*, 2011 WL 3423971 [SD NY 2011].)

This Court is not persuaded that respondent's decision to freeze Moto's account was an unequivocal act, inconsistent with an assertion that the separate entity rule remains valid. Respondent's decision to freeze Moto's account can also been seen as a bank's attempt to minimize its liability for any transfers out of the account while it undertakes its own review of the law, in the face of great uncertainty as to whether the separate entity rule remains good law. Following petitioner's reasoning, respondent could have preserved its right to challenge the restraining notice only by permitting the restraining notice to be violated.

In addition, the email from counsel for RBC Law Group, which advised that proceeds were being held pursuant to the restraining notice, was apparently sent on August 17, 2010. (Agulnick Opp. Affirm., Ex A). All of the transfers out of Moto's account that are purported violations of the restraining notice occurred before counsel for RBC Law Group acknowledged in the email that it was honoring the restraining notice.

Thus, petitioner has not demonstrated that respondent's acknowledgment that it was freezing Moto's accounts, in

itself, constituted waiver of its right to contest the validity of the restraining notice.

**D.**

Because service of the petitioner's restraining notice upon respondent's branch in Manhattan did not restrain bank accounts in Canada, the fact that respondent permitted its account holder to transfer funds out of the account at issue did not violate the restraining notice. Therefore, so much of the petition that seeks a money judgment against respondent for allegedly violating the restraining notice must be denied, as a matter of law.

**III.**

It is undisputed that the underlying judgment was satisfied. CPLR 5222 (b) provides that a restraining notice is in effect "until the expiration of one year after the notice is served upon [the garnishee], *or until the judgment or order is satisfied or vacated, whichever occurs first.*" (Emphasis ***16** supplied.) [13] Because the underlying judgment was satisfied, respondent contends that petitioner would not be entitled to a money judgment against respondent for having violated the restraining notice.

The Court of Appeals has held that "violation of the restraining notice by the party served is punishable by . . . a special proceeding under CPLR article 52 brought by the aggrieved judgment creditor." (*Aspen Indus.*, 52 NY2d at 580; see also *Nardone v Long Is. Trust Co.*, 40 AD2d 697 [2d Dept 1972].) In *Nardone*, the Appellate Division, Second Department stated that the amount of damages for violation of a restraining notice is:

"*the amount of the judgment remaining unsatisfied, but limited to the amount in the account which would have been available to satisfy the judgment* (some portion of the amounts on deposit in the account may have represented trust funds or otherwise may not have been the property of the judgment debtor), and costs."

(*Nardone*, 40 AD2d at 697 [emphasis supplied].) Here, because the judgment was undisputedly satisfied, the amount of petitioner's damages would be zero.

*Tri-Mar Contractors v Bank of Suffolk County* (81 AD2d 637 [2d Dept 1981]) supports respondent's argument that no damages are recoverable for violating a restraining notice if the underlying judgment is satisfied. In *Tri-Mar Contractors*, the plaintiff brought an action to recover damages for violation of a restraining notice. The lower court denied the Bank of Suffolk County's motion for summary judgment and granted the plaintiff's cross motion to compel disclosure. On appeal, the Appellate Division, Second Department, reversed the lower court's decision, reasoning, "Subsequent to the entry of the order from which this appeal was taken, the underlying judgment sought to be enforced by the plaintiff via a restraining notice was satisfied. Accordingly, plaintiff's claim against the defendant has become moot." (*Id.*)

Petitioner does not address *Tri-Mar Contractors* in its opposition papers, and argues that the petition is not moot because it is entitled to recover attorneys' fees and expenses incurred "to chase the Judgment Debtor's assets down and fully satisfy the judgment through other means." (Agulnick Opp. Affirm. ¶ 33.)

*Nardone* and *Tri-Mar Contractors* make clear that the amount of damages for violation of a restraining notice does not include attorneys' fees. However, *Nardone* allowed recovery of costs. The issue presented is whether the "costs" recoverable, as set forth in *Nardone*, includes attorneys' fees incurred in preparing the restraining notice, enforcing the restraining notice, and in locating the assets of the judgment debtor and enforcing any portion of the unsatisfied judgment against those assets.

"It is fundamental today that costs awarded in an action normally are separate and distinct from award of attorney's fees. In civil actions there may be an award to the prevailing party for certain statutory Court and related costs (CPLR arts 82, 83). . .

Attorney's fees on the other hand are not ordinarily recoverable as costs."

(*Schwartz v Durning*, 104 Misc 2d 1018, 1019 [Town Ct, Westchester County 1977][collecting cases]; *Hayman v Morris*, 37 NYS 2d 884, 891 [Sup Ct, NY County 1942]["It is generally agreed ***17** that the term costs' or expenses', as employed in a statute, ordinarily does not include attorneys fees'].) As respondent points out, "[u]nder the general rule, attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule. " (*Hooper Assocs., Ltd. v AGS Computers*, 74 NY2d 487, 491 [1989].)

Global Tech, Inc. v Royal Bank of Can., Slip Copy (2012)
Case 1:07-cv-02715-TPG   Document 586-3   Filed 06/21/13   Page 11 of 13
34 Misc.3d 1209(A), 2012 N.Y. Slip Op. 50023(U)

CPLR 8201 provides that the costs awarded in an action (or special proceeding) shall be "[$200] for all proceedings before a note of issue is filed; plus [$200] for all proceedings after a note of issue is filed and before trial; plus [$300] for each trial, inquest or assessment of damages."

Whether or not costs are awarded, CPLR 8303 (a) (2) permits the court to award, in its discretion, "to any party to a difficult or extraordinary case, where a defense has been interposed, a sum not exceeding five per cent of the sum recovered or claimed, or of the value of the subject matter involved, and not exceeding the sum of [$3,000]." However, "[a]bsent the existence of express authority for their recovery, as here, attorneys' fees should not be awarded under the guise of an additional allowance pursuant to CPLR 8303, subd. a, par. 2." (*Tucker v Toia*, 64 AD2d 826, 827 [4th Dept 1978]; *accord Hoffliss Water Corp. v Arne*, 88 AD2d 989, 990 [2d Dept 1982][an abuse of discretion for Special Term to have awarded counsel fees under the guise of an additional allowance pursuant to CPLR 8303 (a) (2)].)

Given all the above, the "costs" recoverable as part of the money judgment against a garnishee for violation of a restraining notice do not include attorneys' fees.

Finally, pursuant to CPLR 8303 (b), the court, "on a motion relating to enforcement of a judgment, may award to the judgment creditor a sum not exceeding five per cent of the judgment or fifty dollars, whichever is more." "Conceptually, the allowance authorized by CPLR 8303(b) is intended to be an indemnity for the expense of the enforcement motion, including the attorney's fee."(1-8303 New York Civil Practice: CPLR ¶ 8303.24.) Here, petitioner has not requested a discretionary allowance pursuant to CPLR 8303 (b). In any event, this Court would have denied the allowance, given the Court's ruling that respondent did not violate the restraining notice.

Because the underlying judgment was satisfied, and because petitioner is not entitled, as a matter of right, to recover attorneys' fees incurred in enforcing the restraining notice, petitioner would not be entitled to any money judgment against respondent for violation of the restraining notice.

### IV.

The branch of the petition seeking an order of contempt against respondent is denied.

"To sustain a civil contempt, a lawful judicial order expressing an unequivocal mandate must have been in effect and disobeyed. Moreover, the party to be held in contempt must have had knowledge of the order, although it is not necessary that the order actually have been served upon the party. In addition, prejudice to the rights of a party to the litigation must be demonstrated."

(*McCain v Dinkins*, 84 NY2d 216, 226 [1994].) As discussed above, service of the restraining notice upon respondent's bank branch in New York was not effective to restrain Moto's account in Canada, by virtue of the separate entity rule. Therefore, petitioner cannot demonstrate that respondent disobeyed a lawful judicial order restraining the proceeds in Moto's account.

### V. *18

Finally, the branch of the petition that seeks a money judgment against the respondent pursuant to CPLR 5227 is denied as inapplicable. CPLR 5227 states,

"Upon a special proceeding commenced by the judgment creditor, against any person who it is shown *is or will become indebted to the judgment debtor*, the court . . . may direct that a judgment be entered against such person in favor of the judgment creditor"

(emphasis supplied). CPLR 5227 does not apply because, at the time of this proceeding was commenced, respondent was not then currently indebted to Moto, or about to become indebted to Moto. Respondent purportedly tendered a check to petitioner's counsel on April 12, 2011, representing all the funds that Moto had on deposit with respondent. (Shkolnik Affirm., Ex 11.) Petitioner commenced this special proceeding on May 17, 2011. Assuming that the banking relationship between respondent and Moto was a debtor-creditor relationship (*Canada Trustco Mortgage Co. v Regina*, (2011) 334 DLR (4th) 385 (Can.); *Greenberg, Trager & Herbst, LLP v HSBC Bank USA*, 17 NY3d 565, 578 [2011]), the documentary evidence conclusively establishes that, when this proceeding was commenced, respondent was not then currently indebted to Moto, or about to become indebted to Moto.

It also appears that petitioner did not serve Moto with notice of the proceeding, as required by CPLR 5227. "The failure to effect such service is not a mere procedural irregularity but rather renders the proceeding jurisdictionally defective." (*Oil City Petroleum Co., Inc. v Fabac Realty Corp.*, 70 AD2d 859

[1st Dept 1979]; see *Buckeye Retirement Co., LLC, Ltd. v Quattrocchi,* 67 AD3d 848 [2d Dept 2009].) Indeed, in a slightly different context, it was held that the defect "went to subject matter." (*Banco Popular N. Am. v Philian Designs LLC,* 48 AD3d 368 [1st Dept 2008].) [14] Thus, the failure to serve the judgment debtor with notice of a CPLR 5227 proceeding is not curable and requires dismissal of this branch of the petition as against the named and served respondent.

## VI.

As discussed above, it is undisputed that petitioner's judgment against Moto has been satisfied in full. Respondent seeks an order either compelling petitioner to file a satisfaction piece, pursuant to CPLR 5020, or directing the appropriate clerk to make an entry on the docket of the satisfaction of the underlying judgment.

This branch of respondent's motion and cross motion is denied as moot. It appears that respondent sent a satisfaction piece to the County Clerk of New York County for filing on or about October 6, 2011. (Agulnick Opp. Affirm., Ex D.)

## CONCLUSION

Accordingly, it is hereby

ORDERED and ADJUDGED that respondent's motion and cross motion (Motion Seq. No. 002) are granted in part to the extent that the petition (Motion Seq. No. 001) is denied, and the proceeding is dismissed, and the remainder of the motion and cross motion to compel petitioner to file a satisfaction piece is denied as moot.

**\*19** Dated: January 11, 2012 ENTER:

New York, New York */s/*

J.S.C.

## FOOTNOTES

Copr. (c) 2013, Secretary of State, State of New York

## Footnotes

1  Respondent submitted the affidavit of Walter Borek, Vice President and Chief Operating Officer, Liberty Plaza Branch and World Financial Center Branch, for the Royal Bank of Canada. Borek avers, among other things, that respondent has four federal branches located in the United States, and that their operations systems are separate from those in Canada. (Borek Aff. ¶ 5.) However, Borek's affidavit, which contains factual averments, may not be considered on a motion to dismiss.

2  In *Intercontinental Credit Corporation*, the court modified a restraining notice served upon the Bank Leumi Trust Co. to restrain to an account held by Bank Leumi le-Israel, B.M., limiting the scope of the assets of the judgment debtor which are located in New York, but compelled Bank Leumi le-Israel, B.M. to comply with a subpoena duces tecum and a notice of deposition. On renewal, the court vacated the subpoena and the deposition notice. (*Intercontinental Credit Corp., Div. of Pan Am. Trade Dev. Corp. v Roth,* 154 Misc2d 639 [Sup Ct, NY County 1991].)

3  "[A]ttachment suits partake of the nature of suits *in rem*, and are distinctly such when they proceed without jurisdiction having been acquired of the person of the debtor in the attachment. . . Having acquired jurisdiction of the person, the courts can compel observance of its decrees by proceedings *in personam* against the owner within the jurisdiction. But it is a fundamental rule that in attachment proceedings the res must be within the jurisdiction of the court issuing the process, in order to confer jurisdiction." (*Douglass v Phenix Ins. Co. of Brooklyn,* 138 NY 209, 219 [1893].)

4  The only indication of what might have guided the Court of Appeals was contained in the officially reported summary of the Court of Appeals's decision, which recounted that,
    "In the Court of Appeals defendant bank argued that it held no property belonging to [the judgment debtor] within the State of New York; that its Frankfurt branch was an entity separate from it for attachment purposes; that the balances in the accounts maintained by [the judgment debtor] therein were payable only at said branch, and that the indebtedness for said balances could, accordingly, not be reached or levied upon by attachment in this State."
    (*McCloskey,* 11 NY2d at 936.)

5  Previously, the Appellate Division limited the *Digitrex* exception. (*Therm-X-Chemical & Oil Corp.,* 84 AD2d 787, *supra*; *see* Section I.A, *supra,* at 5.)

6  "In October 2003, [Bank of Bermuda Ltd] consented to the personal jurisdiction of the Southern District of New York over it, as of the commencement of the proceeding ten years earlier." (*Koehler,* 544 F3d at 81.)

Global Tech., Inc. v Royal Bank of Carl., Slip Copy (2012)
Case 1:07-cv-02715-TPG   Document 586-3   Filed 06/21/13   Page 13 of 13
34 Misc.3d 1209(A), 2012 N.Y. Slip Op. 50023(U)

7   Justice Smith's concerns about forum shopping the enforcement of judgments appear to have been borne out here. Petitioner obtained the judgment against Moto in Michigan. The record does not appear to indicate that Moto has minimum contacts with New York, and the assets sought to be restrained were maintained in a bank account in Canada.

8   A federal District Court rejected this distinction, stating,
    "Plaintiff argues that *Koehler* does not apply to the within action because it pertained to turnover orders rather than restraining orders. [citation omitted.] However, a restraining order is a less intrusive remedy than a turnover order. It follows, therefore, that if New York courts have the authority to order garnishees to turn over out-of-state property belonging to a judgment debtor, they have similar authority to order such garnishees to merely restrain out-of-state property. Moreover, the holding in *Abuhamda v. Abuhamda*, 236 AD2d 290, 654 N.Y.S.2d 11 (1st Dep't 1997) makes clear that New York courts can restrain out-of-state property."
    (*McCarthy v Wachovia Bank, N.A.*, 759 F Supp 2d 265, 275 [ED NY 2011].)

9   A restraining notice is unlike a turnover order or an order of attachment. A party seeking a turnover order or an order of attachment must commence an action or proceeding and obtain a court order; personal jurisdiction must be acquired over the debtor or garnishee for a turnover order or an order of attachment to reach assets outside the State of New York.
    By contrast, a party that seeks a restraining notice need only engage an attorney, who is authorized to issue a restraining notice as an officer of the court. (*See* CPLR 5222[b].) The Court has no involvement with the issue of whether service of the restraining notice upon the garnishee comports with due process until the garnishee challenges the restraining notice, or until the judgment debtor seeks an order of contempt or a money judgment against the garnishee.

10  CPLR 5240 allows the court, "at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."

11  The Clearing House Association, LLC stated, among other things:
    "Although the separate entity doctrine has historically been applied to deposit accounts, its logic would also apply to other classes of assets held by banks outside New York for their customers. If something as liquid and movable as a deposit account is subject to levy only at the branch where a depositor placed it, a fortiori this must be true for tangible assets such as share certificates that are specifically sited outside the State. The original basis for the separate entity doctrine makes even more sense for assets other than deposit accounts, even in the computer age. A global banking corporation, ordered to deliver into New York certain tangible or intangible assets located abroad, would have great difficulty ensuring that all of its far-flung affiliates received notice of that order, searched their respective records for assets (shares, deeds, safe deposit boxes) they might hold in any number of capacities, and secured them. This would not be, even in the computer age, a click-of-a-button exercise. And the concern about offending foreign laws and practices certainly would apply here as well."
    (*Koehler v Bank of Bermuda Ltd.*, 2009 WL 1615261, at *20-21.)

12  That is not to say that the separate entity rule limits all post-judgment enforcement process. In 2006, the Legislature amended CPLR 5224, which governs subpoenas, to add a new subdivision providing that a person served with a subpoena duces tecum in New York, or a business entity doing business, licensed, or otherwise qualified to do business in New York, is subject to full disclosure permitted under CPLR 5223. (CPLR 5224 [a-1].) The person served is also required to produce materials in that person's custody, possession or control for review by the judgment creditor, irrespective of whether the materials are inside or outside the State of New York. (*Id.*)

13  Here, on this pre-answer motion and cross motion, the parties do not indicate when the underlying judgment was satisfied. It cannot be determined from this record whether the restraining notice was in effect when Moto transferred money out of its Canadian bank account.

14  *Banco Popular* involved a petitioner's compliance with CPLR 6214 (d), who failed to served debtors with notice of a special proceeding against a garnishee served with an order of attachment against the debtors.

---

**End of Document**                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.