# EXHIBIT B

1

```
 1   d920repa                 Argument
 2   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x
 4   NML CAPITAL, LTD.,
 4              Plaintiff,
 5        v.                          03 CV 8845
 5   REPUBLIC OF ARGENTINA,
 6              Defendant.
 6
 7   ------------------------------x
 8   Dieter Scheck,
 8            Plaintiff,          10 CV 5167
 9        v.
 9   REPUBLIC OF ARGENTINA
10   ------------------------------x
11                               New York, N.Y.
11                               September 3, 2013
12                               2:46 p.m.
12
13   Before:
13
14              HON. THOMAS P. GRIESA,
14
15                               District Judge
15
16                     APPEARANCES
16
17   For Plaintiffs:
17
18   ROBERT COHEN
18   DANIEL RAPPORT
19   MARTIN GUSY
19
20   For Defendants:
20   CARMINE BOCCUZZI, JR.
21   LANCE CROFFOOT-SUEDE
21   JAMES KERR
22
23
24
25
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

```
 1                  (In open court)
 2             THE DEPUTY CLERK:  All rise.
 3             Be seated.
 4                  (Case called)
 5             THE DEPUTY CLERK:  Counsel, state your last name
 6    before you speak.
 7             THE COURT:  Before the counsel go ahead with what they
 8    wish to present, I would just like to ask this.  NML, just
 9    refresh my memory, NML is one party or --
10             MR. COHEN:  One party.
11             THE COURT:  -- or all of the parties who have
12    prevailed on the pari passu?
13             MR. COHEN:  We are one of several prejudgement
14    plaintiffs in the pari passu actions.  There are others.
15             THE COURT:  Now, there are other plaintiffs besides
16    the -- I'll talk about, using it loosely, the pari passu
17    plaintiffs.  There are other plaintiffs who are seeking
18    discovery through these subpoenas, right?
19             MR. COHEN:  Of the three plaintiffs who are seeking
20    discovery, one is not a pari passu plaintiff, two of us are.
21             THE COURT:  The two who are --
22             MR. COHEN:  The Aurelius plaintiffs and NML are both
23    pari passu plaintiffs.  The Scheck plaintiffs are not.
24             THE COURT:  Who wishes to go first, the people who
25    want to vacate the subpoenas, or the people in support of the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   subpoenas, or what.
 2             MR. COHEN:  Your Honor, I would be happy to start,
 3   because there are both document requests and interrogatories to
 4   Argentina, which are common to the three of us and, also, bank
 5   subpoenas that the Aurelius plaintiffs have filed and are fully
 6   briefed.  NML has bank subpoenas pending, but are not fully
 7   briefed.  But the common element of the motions before you this
 8   afternoon are the requests for discovery from Argentina.  And I
 9   can start there, your Honor.
10             Despite the August decision last year of the Second
11   Circuit which affirmed your Honor's decision with respect to
12   discovery from two banks, Bank of America and BNA, that FSIA,
13   Foreign Sovereign Immunities Act immunity does not have
14   anything to do with post judgment discovery.  It is not a
15   limitation on post judgment discovery, in that parties are
16   entitled to discovery with respect to the assets of their
17   judgment debtor.  And the FSA imposes no restrictions on that.
18   And despite your Honor's ruling in March, which in the Aurelius
19   case found that Argentina's motion for a protective order with
20   respect to the discovery that was served on Argentina should be
21   denied because of what the Second Circuit held, we still see in
22   the papers before you at least some remnants of that argument.
23   And I think we should --
24             THE COURT:  Remnants of what argument?
25             MR. COHEN:  That the FSIA immunity limits the
```

```
 1   discovery that a post judgment plaintiff may take of the
 2   debtor.  They do that, I think, because they have a petition
 3   for certiorari pending in the Supreme Court for review of the
 4   Second Circuit decision.  But for purposes of these motions, we
 5   think those issues are behind us, at least for now.
 6             THE COURT:  So what issue do I need to deal with?
 7             MR. COHEN:  Well, there are some other issues that
 8   they have raised that are common to us.  In particular, an --
 9             THE COURT:  The Republic has raised.
10             MR. COHEN:  The Republic has raised in objecting to
11   the discovery requests by the three plaintiffs.  In particular,
12   they have argued that the restriction in the Foreign Sovereign
13   Immunities Act with respect to military property, should
14   deprive us of discovery with respect to that property.  They
15   have argued that the Vienna Convention on Consular Relations
16   puts a limitation on discovery with respect to diplomatic
17   accounts.  And they have argued that the Foreign Sovereign
18   Immunities Act provision with respect to central banks in the
19   limitation on discovery, the recovery of assets from central
20   banks puts a limit on discovery that we can take with respect
21   to the central bank.  And I'd just like to address each of
22   those for a moment.
23             THE COURT:  Just refresh my memory.  Just go back.
24   What is the discovery that you were seeking?
25             MR. COHEN:  We are, each us, is asking for discovery
```

```
 1    with respect to the assets of Argentina, Argentina defined,
 2    slightly differently among us.  But ministries included,
 3    various entities that are corporations owned by Argentina
 4    through which it does its business.  We each have a slightly
 5    different list of entities that we include within the
 6    definition of Argentina.  But we're asking for assets of
 7    Argentina.  Again, slightly different variations on the theme.
 8    We've limited, for the purposes of this round of discovery, to
 9    assets in, or partially in, the United States.  Aurelius and
10    the Scheck plaintiffs have asked for world-wide discovery,
11    slightly very different themes.  But all of us are asking for
12    fairly broad discovery about assets.  And we, unlike the other
13    two plaintiffs, have asked for information with respect to four
14    entities which we think can show are alter egos of Argentina.
15    So our discovery of Argentina is asset and alter ego.  And the
16    other two plaintiffs are just asset-related discovery.  And in
17    opposition to all three of our requests for information,
18    Argentina has argued that they should be able to carve out the
19    three categories of information that I described; military,
20    diplomatic, and central bank.  And I would just say with
21    respect to each of them, what they are saying is we may not be
22    able to execute on that information and, therefore, we're not
23    entitled to it.  Our position is there are exceptions to each
24    of those limitations.  And if we can establish them, we can
25    take those assets.  And we're entitled to the discovery, so
```

6

```
 1    that we can come to your Honor and say this asset meets the
 2    exception and we're entitled to it.  So for example, with
 3    respect to the central bank, there is a provision in the
 4    Foreign Sovereign Immunities Act that exempts central bank
 5    assets from execution.  But there is an exception that says
 6    that if we can demonstrate with specificity that the funds are
 7    not being used for central bank functions, as such functions
 8    are normally understood, then we can take it.  That was the
 9    Second Circuit's decision that vacated the attachments that we
10    had won on the central bank deposit at the federal reserve.
11    They vacated our attachment, but with that caveat.  If we can
12    come back with specificity, showing that those assets are not
13    being used for traditional central banking activity, we can
14    take the asset.  The only way we can show that, is by taking
15    discovery.
16            Similarly, with respect to military property, the
17    Foreign Sovereign Immunities Act makes property of a sovereign
18    immune from attachment and execution if the property is, or is
19    intended to be used, in connection with the military activity.
20            So, if there is an account in the name of the defense
21    ministry, but it's being used to pay the country's debts, it's
22    not intended to be used for military activity.  The mere fact
23    that it is in the name of the account that is in the name of
24    the Army does not automatically protect it.  We are entitled to
25    find out if there is such an account, and then to see if we can
```

```
 1    meet the standard to show that it is not intended to be and is
 2    not being used in connection with military activity.
 3              These are not absolute prohibitions on the attachment
 4    of assets or the execution.  They are limited.
 5              THE COURT:  What is the exception about the military?
 6              MR. COHEN:  The military says it's immune if the
 7    property is, or is intended to be, used in connection with a
 8    military activity and: (a) is of a military character, or(b) is
 9    under the control of a military authority or defense agency.
10              THE COURT:  What are you reading from?
11              MR. COHEN:  This is the Foreign Sovereign Immunities
12    Act, your Honor, 1611.
13              THE COURT:  Okay.
14              MR. COHEN:  So these are limited --
15              THE COURT:  Exceptions even as to the military.
16              MR. COHEN:  Yes, your Honor.
17              THE COURT:  Okay.
18              MR. COHEN:  And with respect to diplomatic accounts,
19    they cite to the Vienna Convention.  The Vienna Convention,
20    again, immunizes -- and this is by treaty, this is not in the
21    Foreign Sovereign Immunities Act.  But the Foreign Sovereign
22    Immunities Act is subject to any treaties that the United
23    States has entered into.  The diplomatic assets that are
24    protected are those used for diplomatic purposes.  We are
25    entitled to determine whether an account that happens to be in
```

```
 1   the name of the embassy is, in fact, being used for diplomatic
 2   purposes.  If it were otherwise, Argentina would repay its debt
 3   to the exchange bond holders by putting it into accounts in the
 4   name of the embassy in New York.  That can't be what was
 5   intended, and it clearly isn't what was intended by the Vienna
 6   Convention.
 7              It also is intended to limit subpoenas to embassies
 8   and that sort of thing.  We're not subpoenaing the records of
 9   an embassy, we are asking the sovereign country to tell us what
10   it knows about accounts that are within this Court's
11   jurisdiction.
12              THE COURT:  The Vienna Convention is what you are
13   talking about.
14              MR. COHEN:  Yes, your Honor.
15              THE COURT:  Okay.
16              MR. COHEN:  So we think that, to the extent that
17   Argentina is relying on the Foreign Sovereign Immunities Act,
18   arguments to object to our discovery, or the Vienna Convention,
19   those deserve to be rejected out of hand at this point.
20              And now, your Honor, I am happy to talk more
21   specifically about NML's discovery of Argentina.  We think that
22   the discovery with respect to alter egos, and as to assets, is
23   almost plain vanilla-type stuff.  The objections we have got
24   are, with respect to assets, the answers we have gotten, we
25   have no assets that are used for commercial activity in the
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

9

```
 1    United States.  I'd say that puts the rabbit in the hat, your
 2    Honor.  They can't self determine whether the assets are, or
 3    are not, used for commercial activity in the United States.
 4              THE COURT:  Well, how does the alter ego thing get
 5    into this?
 6              MR. COHEN:  We have asked for discovery with respect
 7    to the relationship between Argentina, the sovereign, and the
 8    entities that -- the four entities that we have named.  Whether
 9    they have -- we want to see the communications.  We want to
10    understand their obligations, one to other.  Because it's our
11    view that these four entities are controlled day-to-day by
12    Argentina, and should be responsible for Argentina's debts to
13    us under the Bank Act of Supreme Court test, which says if we
14    can show that they are in effect the agent of Argentina, or
15    they are engaged in fraudulent activity through the agent, then
16    they are the alter ego, and they are responsible for the debts
17    of Argentina.
18              And these are not fishing expeditions.  We have
19    tried --
20              THE COURT:  I don't quite understand why you need to
21    get into alter ego issues about the military.
22              MR. COHEN:  Well, those are separate, your Honor.
23              The military assets respect are with respect to the
24    asset discovery.  They have objected to giving us information
25    about assets, to the extent that they may be held by the
```

```
 1   military.  They have rejected to giving us information about
 2   assets to the extent they may be in diplomatic accounts, or
 3   central bank assets, because of the argument that there is an
 4   immunity in the Foreign Sovereign Immunities Act with respect
 5   to those assets.  So that's asset related.  And those are the
 6   objections that they have made on that side of our discovery.
 7            Then we have alter ego discovery, where we have asked
 8   for the relationship between Argentina and four entities.  And
 9   some of them, your Honor, have been before you in the past;
10   BNA, BCRA, central bank, Enarsa, which we attempted to show as
11   an alter ego and to seize a cargo of natural gas that was being
12   sold through Morgan Stanley.  And an entity called YPF, which
13   was recently nationalized by Argentina and is an international
14   oil production and distribution company, now owned, majority
15   owned, by Argentina.  With respect to those four --
16            THE COURT:  Go over those.  The --
17            MR. COHEN:  BNA is the bank that's a hundred percent
18   owned by Argentina, operates in New York.
19            THE COURT:  And then?
20            MR. COHEN:  Then there is BCRA, which is the acronym
21   for the Central Bank of Argentina, which as you know is the
22   subject of a multi-year litigation of attachment of its funds
23   at the Federal Reserve Bank here in New York.
24            THE COURT:  Go ahead.
25            MR. COHEN:  And ENARSA, which is an acronym for an
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
 1    Argentine-controlled entity that is involved in the acquisition
 2    and distribution of natural gas and other heating and other
 3    products that are distributed in Argentina, and are acquired
 4    from suppliers around the world, including from suppliers in
 5    New York.  And the last one is a company called YPF, which is
 6    an international oil production company that recently was
 7    nationalized by Argentina.
 8              THE COURT:  International what?
 9              MR. COHEN:  Oil production and distribution company.
10              THE COURT:  I take it what you are seeking is not a
11    ruling, now, that there is the alter ego, but you are seeking
12    discovery so that you can determine whether to make a final
13    motion about alter ego; right?
14              MR. COHEN:  That's correct, your Honor.
15              THE COURT:  So you're seeking discovery.
16              MR. COHEN:  Discovery.
17              THE COURT:  Not the final declaration from the Court.
18              MR. COHEN:  That's correct, your Honor.  Just
19    discovery.
20              And as to that discovery, essentially Argentina has
21    argued that those entities are not responsible for the debts of
22    Argentina, therefore we shouldn't be entitled to the discovery.
23    And, again, we say that puts the rabbit in the hat.  We can't
24    determine whether or not they are the alter ego and are
25    responsible for the debts until we get discovery.  And our
```

```
 1   discovery, we think, is measured, is not unduly burdensome
 2   given the enormous debt we're owed.  And, in fact, Argentina
 3   really hasn't offered a significant argument that they can't
 4   give us the information.  They just say, in effect, that you
 5   know we've not established that these people are their alter
 6   ego and are responsible for the debt and, therefore, we're not
 7   entitled to it.  And, of course, that is directly contrary to
 8   the Rafidain holding in the Second Circuit which said that
 9   Judge Rakoff had erred and abused his discretion when he
10   refused to allow discovery from a sovereign over which the
11   Court had jurisdiction with respect to alter ego
12   characteristics of another entity that plaintiff wanted to show
13   was responsible for the debts of its debtor.
14           So, we think our discovery is measured, appropriate,
15   and that their objections really have no basis.
16           THE COURT:  Well, before I hear from Argentina,
17   perhaps I should hear from the other plaintiffs.
18           MR. RAPPORT:  Good afternoon, your Honor, Daniel
19   Rapport from Friedman Kaplan.  I represent the Aurelius and
20   Blue Angel plaintiffs.
21           On March 7, your Honor issued an opinion in our case
22   where you told us that we needed to tailor our discovery
23   requests, and we did that.  We submitted a reply brief that
24   included tailored requests to Argentina and, also, to the
25   banks.  We have discovery to Argentina, and we have subpoenas
```

```
 1   to five banks.
 2                THE COURT:  What banks are you --
 3                MR. RAPPORT:  CitiBank, Barclays, Deutsche Bank.
 4                THE COURT:  Just a minute.
 5                MR. RAPPORT:  Sorry.
 6                THE COURT:  Go ahead.
 7                MR. RAPPORT:  And two banks that have been before your
 8   Honor before, Bank of America, and BNA.
 9                THE COURT:  Okay.
10                MR. RAPPORT:  We narrowed our requests and tailored
11   OUR requests to focus on what we believe are the core
12   categories of commercial activity and commercial assets; things
13   like bank accounts, real estate, wire transfers, investments.
14   We believe that the banks would have this information in
15   computer format.  And we believe that the Republic has this
16   information, because it's own laws and regulations require it
17   to collect much of this information, as well.
18                Notwithstanding our good faith efforts to narrow the
19   requests, we still face various objections from the Republic
20   and the banks.  The first issue that I would like to address
21   with your Honor concerns the entities that we have included on
22   our list of entities within the definition of Argentina.  There
23   are 393 such entities.  More than 70 percent of which are
24   things such as ministries and secretariats.  Things that there
25   is no real dispute, they are part of the Republic.
```

```
 1              There are, on our list, another 36 military or --
 2    well, what the Republic is calling military or diplomatic
 3    entities, which Mr. Cohen just spoke about.  And I'll say just
 4    on that issue, your Honor, it's not just that the Republic is
 5    saying we are not entitled to discovery of military or
 6    diplomatic assets.  What they are saying is we are not entitled
 7    to discovery of assets held by ministries or agencies that they
 8    designate as military or diplomatic.
 9              So, for example, they would bar all discovery
10    concerning the ministry of justice and human rights.  Which, by
11    my view of it, doesn't necessarily subsume entirely military or
12    diplomatic activity by that ministry, but we, under the
13    Republic's view of the role would be completely barred from any
14    discovery concerning that ministry.
15              So as I said, there is the 70 percent that are
16    ministries and secretariats.  There is this 36 purportedly
17    military or diplomatic entities.  And then there are 83
18    autarchic or decentralized entities, which Mr. Cohen was
19    as mentioning them before.  One of them is BCRA.  But, again,
20    the Republic and the banks, following in the Republic's
21    footsteps, take issue with our including these entities on our
22    list of the definition of Argentina --
23              THE COURT:  What kind of entities are you talking
24    about?
25              MR. RAPPORT:  It's a good question.
```

```
 1              These are entities that Argentina has set up to carry
 2    out its governmental functions, like the National Library, the
 3    National Endowment for the Arts, the National Securities
 4    Commission, the National Tax Tribunal, the Atomic Energy
 5    Commission, the Regulator of Water and Sanitation, the Civil
 6    Aviation Administration.  That's just to give you a flavor of
 7    the sort of entities that we are talking about.  And we have
 8    included them on our list, because they seem to be carrying out
 9    governmental functions.  They were set up by Argentina to carry
10    out governmental functions.  And Argentina has a history of
11    conducting its affairs and holding its assets through these
12    entities, such as BCRA.  So they take issue with our list of
13    entities.  And, by the way, I'll also mention that, in response
14    to your Honor's March opinion, we deleted more than 100
15    state-owned companies that they took issue with.
16              So they take issue with all our list of entities.  And
17    we think that we're entitled to get discovery with respect to
18    the assets of all of these entities, to the extent the Republic
19    has the information, or the banks have the information.
20              So that's the first issue, your Honor.
21              The second issue is an issue that the banks have
22    raised, where we have asked them to produce -- as I mentioned
23    before, we subpoenaed basically five banks.  There are more
24    than five subpoenas, because we issued subpoenas to multiple
25    members of a particular banking organization.  But within each
```

```
 1    of these banking organizations, we subpoenaed the top entity,
 2    the top parent entity.  And the banks are complaining about
 3    producing documents or information that is maintained in the
 4    files of their subsidiaries.
 5             There is no dispute that each of these top entities is
 6    subject to the jurisdiction of this Court.  And we don't think
 7    that there is any real dispute that, as a practical matter, the
 8    apparent entity has the ability to get the document from the
 9    subsidiaries.  If the CEO or CFO, or Chief Risk Officer of any
10    of these entities wanted to get the information from their
11    subsidiaries, they could get the information.  And we think
12    that the bank's own public statements make clear that as a
13    practical matter they are acting as integrated international
14    banking organizations.  And this is all set out in our briefs,
15    as well.
16             The next issue concerns the Separate Entity Doctrine.
17    And CitiBank and Deutsche Bank have raised that doctrine as an
18    excuse for not producing information from their overseas
19    branches.  The Separate Entity Doctrine, to the extent it is
20    still good law, applies, if at all, to attachment and
21    execution.  And it says: If assets are held in an overseas
22    branch, or assets are held in a branch that wasn't subject to
23    the subpoena, or was not served with the subpoena, you may not
24    be able to attach or execute those assets.  But that has
25    nothing to do with discovery.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              And, indeed, New York law, and in particular a
 2    provision of the CPLR 5224(a)(1), specifically requires that
 3    third parties, such as the banks, with information about
 4    judgment creditors, should provide that information whether the
 5    materials sought are within, quote, "within or without the
 6    state."  And I'll just mentioned that this Court has previously
 7    ordered CitiBank to produce information from its Argentine
 8    branch.
 9              There is a decision from a New York State Supreme
10    Court, trial court, the Ayyash decision that CitiBank and
11    Deutsche Bank latch onto, where the Court denied a motion to
12    compel.  That decision is on appeal, and we think it is at odds
13    with every other decision concerning the Separate Entity
14    Doctrine, which has only applied the Separate Entity Doctrine
15    in the context of attachment and execution, and not in the
16    context of discovery.
17              And I'll also point out that there is a pretty
18    fundamental difference between the facts of the Ayyash case and
19    facts here.  In Ayyash the Court noted that there was an
20    absence of any connection of the party, the underlying
21    controversy, or any race in New York.  Well, here, we clearly
22    have a strong connection to New York.  Argentina consented to
23    jurisdiction here.  And the contract in dispute is governed by
24    New York law.
25              Next, we hear from the banks that we should proceed
```

18

```
 1    first through the Hague Convention, and that we have to proceed
 2    first through the Hague Convention before serving subpoenas
 3    here.
 4             Well, this Court has, as noted, previously ordered
 5    BNA, and B of A, and CitiBank to produce information without
 6    ever requiring that any of the creditors here go through the
 7    Hague Convention.  And that's not surprising, because the
 8    Supreme Court and the Second Circuit, long ago, rejected the
 9    notion that you had to proceed in the first instance through
10    the Hague Convention.
11             And on the foreign law issue, your Honor recently
12    dealt with this issue in the NML cases with respect to various
13    foreign law objections that were raised by BNA.
14             There is a plethora of authority that foreign law is
15    not a bar to a bank complying with a valid discovery order, and
16    that's exactly what your Honor found in the context of the DNA
17    foreign law objections, with respect to the laws of Argentina,
18    and Spain, and Brazil, and Bolivia, the Cayman Islands, Chile,
19    Panama, and Paraguay.
20             Your Honor thought that there might be an issue with
21    Uruguayan law.  But, then, your Honor went through the
22    restatement analysis with the various factors and restatement
23    analysis, such as importance to the litigation, the specificity
24    of the requests, the location of the information, the
25    availability of alternative means, the hardship, good faith of
```

```
 1    the party resisting the production, the balance of national
 2    interest.  In balancing and weighing all of those factors, your
 3    Honor determined that even if Uruguay's law would have maybe
 4    barred production, under the restatement, production was still
 5    warranted here.  And we believe that that same analysis, as to
 6    BNA, it is the exact same laws, it's the exact same assertions
 7    that they are making.  And we believe that your Honor's
 8    decision in the NML cases with respect to the foreign law
 9    objections raised by BNA disposes of the BNA foreign law
10    objections.
11            The other banks have not cited any particular foreign
12    laws.  And they said, wait a minute, it is too early, we don't
13    know what jurisdictions are going to be in play.  And what you,
14    the plaintiffs, are basically asking us to do is to produce
15    declarations from all of the jurisdictions where we operate.
16            That's not what we were saying.
17            THE COURT:  What is it you're asking the banks to
18    produce?
19            MR. RAPPORT:  Yes.  Your Honor, we have at this point
20    five requests to the banks.  We have two requests that concern
21    accounts, where we ask them to identify accounts at the bank.
22    And then the second request asks them to identify certain
23    information with respect to those accounts.
24            Then we ask them to identify transfers that go through
25    the bank.  This is analogous to the requests that your Honor
```

1    saw previously in the NML request to BNA and B of A.  And this
2    is the same request that we have made here, and NML has made to
3    the banks in its subpoenas to the banks, its subsequent round
4    of subpoenas to the banks.  That's the third request.
5            The fourth request is we asked the banks to identify
6    any financial arrangements it has with Argentina.  Here we're
7    trying to explore all of these requests, and what we understand
8    to be the businesses of the bank.
9            So the bank maintains accounts.  And then the bank
10   processes wire transfers and things like that.  And then the
11   bank enters into financial transactions with its customers;
12   repo transactions, loans, and that sort of thing.  And so we
13   are asking the banks to identify the transactions that it has
14   with Argentina, if it has any.
15           And then the fifth request asks the banks to identify
16   if there have been any prospective, or any discussions
17   concerning prospective loans or issuances of securities or the
18   like.  Because there were thinking, well, there have been such
19   discussions.  That might mean that there is money coming into
20   Argentina.  And we would like to be able to try to attach or
21   execute on that money.
22           So those are the five requests that we have to the
23   banks, your Honor.
24           THE COURT:  All right.  Who else for the plaintiff
25   side?  Anybody?

```
 1              MR.GUSY:  For the Scheck plaintiffs, your Honor.
 2              The Scheck plaintiffs, of course, are in a different
 3     position, since they are German individuals --
 4              THE COURT:  You're Mister?
 5              MR. GUSY:  I'm sorry?
 6              THE COURT:  You're Mister?
 7              MR. GUSY:  Gusy.
 8              THE COURT:  All right, Mr. Gusy.
 9              MR. GUSY:  Thank you.
10              The issue involving the Scheck plaintiffs are in front
11     of the Court by means of a motion from the Republic to quash
12     our information subpoena that has been served in late
13     November 2012.  Of course the Scheck plaintiffs are in a
14     different position than NML and Aurelius, inasmuch as these are
15     not pari passu plaintiffs as we established early on, but they
16     are also individuals that have paid a dollar for a dollar when
17     subscribing to the underlying bonds.
18              I would reserve my right to respond to Argentina's
19     arguments as far as the motion to quash is concerned, inasmuch
20     as Argentina might make additional points that have not yet
21     been addressed by my colleagues Cohen and Rapport.  And the
22     only preliminary matter I would like to address is that there
23     is a motion pending to confirm or, in the alternative, to renew
24     plaintiff's restraining notice.  Of course, the FSIA requires
25     the plaintiffs to identify specific assets for them to be
```

```
 1    restrained by this Court.
 2                THE COURT:  I thought we were here just on discovery.
 3                MR. GUSY:  Yes, your Honor.
 4                The first part of the motion to quash the information
 5    subpoena that the Scheck plaintiffs have served are solely
 6    related to discovery.  However, since the information subpoena
 7    was served together with a restraining notice, if you want an
 8    adjunct to this motion that entails the Scheck plaintiffs
 9    asking to confirm, or in the alternative to renew, the
10    restraining notice that has been served, I'm fully aware of the
11    plaintiff's obligation to identify specific assets.  And that's
12    why I wanted to address it at this point.  Of course without
13    having received the information that we are seeking by means of
14    having served information subpoenas --
15                THE COURT:  I wonder if it would be possible, so that
16    we can -- we have got a lot of work to do on discovery.  Could
17    we simply separate out your motion about restraining?
18                MR. GUSY:  Your Honor, that's what I wanted to do, if
19    I may interrupt.  I wanted to withdraw the request.
20                THE COURT:  Oh, I didn't understand it.
21                MR. GUSY:  So we do not have to address it, here, in
22    this forum.
23                THE COURT:  All right, fine.  Motion granted to
24    withdraw, all right.
25                All right, now, from the Republic.
```

```
 1            MR. BOCCUZZI:  Good afternoon, your Honor, Carmine
 2   Boccuzzi, for Argentina.
 3            Just to go through the motions that you have before
 4   you.  We are here today because in March when your Honor
 5   reviewed the discovery demands made by Aurelius, your Honor
 6   wrote in your decision that the requests were not appropriately
 7   tailored, and you said that we needed to have a conference to
 8   discuss that.  And you sort of put, as a framework, that really
 9   we need to have discovery regarding assets that could
10   realistically be seized by plaintiffs.  And so we're here
11   because in March you had before you a subpoena and demand that
12   said Argentina is 400-plus entities.  Now, the demands are that
13   Argentina is 300-plus entities.  And there is no narrowing at
14   all.  Mr. Cohen was saying, in terms of military, diplomatic,
15   and other categories of information that, in your Honor's
16   words, can not realistically be attachable.  And we know that
17   these could not be realistically attachable, because NML has
18   tried to attach diplomatic accounts -- or the creditors have
19   tried this.  Or military property in Germany, in France, in
20   Belgium, and in Ghana.  And all those attempts have been
21   rejected.
22            And, similarly, we know these alter ego allegations
23   that Mr. Cohen was talking about also do not lead to attachable
24   property, because we have litigated before your Honor the
25   status of Enarsa, that is the oil company that we were
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    discussing just a few minutes ago, Mr. Cohen was discussing a
 2    few minutes ago.  And your Honor, twice, granted motions to
 3    dismiss made by Enarsa and the Republic that sought to claim
 4    that there was an alter ego relationship here.
 5               BNA, the state-owned bank, again in the context of
 6    both attachment efforts of assets of BNA which NML withdrew and
 7    then, later, with a full alter ego complaint before your Honor,
 8    affidavits, documents, your Honor rejected the complaint,
 9    dismissed the complaint, denied discovery, and that discovery
10    that you denied looked much like the discovery they are asking
11    for today.  A decade of communications between Argentina and
12    BNA.  All transactions for a decade.
13               The purported reason was the plaintiffs were saying we
14    need to know all of this, because then we'll show you their
15    alter ego.  Your Honor said, no, I have the material and the
16    information before me, denied the discovery.  The Second
17    Circuit affirmed all of that, the dismissal of the complaint
18    and the denial of the discovery.
19               YPF is a state-owned company.  NML has tried to get
20    discovery from a third party in California, from Chevron.  The
21    magistrate judge had said, no, you don't get that discovery
22    because there are no facts that you have put forward, plausible
23    allegations that there is an alter ego relationship here.
24               And in Texas, where they are pursuing discovery as
25    well related to YPF, they told the Court they are planning to
```

```
 1    file a complaint alleging alter ego.  They have not done that,
 2    so they shouldn't get discovery based on implausible theories
 3    of alter ego.  I would say YPF has a huge public float.  Lots
 4    and lots of people, owning lots of shares of YPF.  And so we
 5    have the problem that your Honor identified in rejecting the
 6    alter ego theory from BNA, that that would work a tremendous
 7    harm on the shareholders of YPF, the creditors of YPF, the
 8    employees of YPF, who one day would wake up and, under NML's
 9    theory, find that this country in fact was liable for the
10    obligations of the Republic of Argentina.
11              Finally, as to BCRA, again, your Honor, you will be
12    hearing us at the end of this month.  They have brought an
13    alter ego complaint against BCRA.  They have had years of
14    discovery about BCRA and its accounts in New York, and what
15    those reserves were doing and being used for.  That was all
16    litigated.  And your Honor is gonna hear the motions to dismiss
17    on that alter ego complaint.
18              So if we just sort of take a step back and just think,
19    both as a practical matter what it is they are asking for, and
20    whether it reaches your Honor's standard of realistically
21    leading somewhere, the answer is no.  And the same logic
22    applies to the military and diplomatic theories that they put
23    forward as well.
24              And on that, just to take a step back, Mr. Cohen
25    referred to it, he is correct that there is a petition
```

1    certiorari pending in the Supreme Court.  The Supreme Court has
2    asked for the views of the solicitor general of the United
3    States.  And we're going to see what happens I think very soon
4    with that case on those issues.
5            But even putting aside that teeing up of that issue
6    for the Supreme Court, the Second Circuit said it's up to your
7    Honor to make sure the discovery demands are prudential and
8    proportionate, and discovery of diplomatic and military
9    property just simply doesn't satisfy those standards.  And the
10   only theory that we have heard is that maybe Argentina is using
11   the old military account to pay its debt.  We know that's not
12   true.  That is just speculation.  We know it is not true
13   because there has also been litigation in this Court about how
14   Argentina pays it debts, and how it pays its bondholders.  And
15   we're keeping the payment mechanism the same, because of your
16   Honor's order in connection with the pari passu litigation.
17           So all of this is -- they need to -- we're not just
18   folding our arms.  We are saying come forward with something
19   that's a little narrower, really a lot narrower -- I don't mean
20   to be sarcastic.  A lot narrower than saying 400 entities, all
21   over the world, diplomatic, military, basically everything.
22   Because that's not prudential and that's not proportional, and
23   that's not going to get us anywhere.  And the important thing,
24   your Honor, is in addition to the information they have got
25   through this litigation that has been before your Honor and in

27

```
 1    other jurisdictions, they have access to a lot of information.
 2    Because a lot of this information is publicly available.  The
 3    Aurelius plaintiffs reference in their brief -- there's
 4    actually a data base, publicly available, of all of the
 5    contracts entered into by Argentina.  They can get into that
 6    data base.  It is -- go on the internet, it is there.  They can
 7    pull stuff off there.  And they can say, look, here is a
 8    theory, here is commercial activity, we want discovery.
 9            We would deal with that.  But that's not what they are
10    doing.  And so we're just left with these very blanket demands.
11            And the other avenue of information they have gotten
12    from your Honor, and this is part of the appeal that is going
13    on, we're trying to bring it to the Supreme Court.  But in
14    getting the discovery they got from Banco De La Nacion and Bank
15    of America, they got wire transfer information about all of the
16    entities.  Any dollar transaction goes through New York.  They
17    got thousands of transactions, information about thousands of
18    transactions from that discovery.  And your Honor also required
19    Banco De La Nacion to produce information from outside of the
20    United States.  So they had all of that information.  The
21    original theory presented to your Honor was they need to know
22    about Argentina's financial circulatory system.  They have
23    gotten the information that shows money flows.  And they have
24    not found properly attachable property.  But that just sort of
25    shows the situation we're dealing with.  Argentina is not
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    Exxon, it's a government.  And so the examples that Mr. Rapport
 2    gave were very telling.  He said we wanted to know about the
 3    libraries, books in Argentina.  Your Honor said in the March
 4    order, no discovery of assets in Argentina.  But, again, on
 5    their face, the subpoenas are not even limited there.
 6            So I think it fails all of those tests.  I think there
 7    should be narrowing on their part.  We have tried to have
 8    dialogue.  There is no agreement in terms of taking the
 9    hundreds of entities off the table.  We keep bumping up against
10    this insistence on diplomatic and military, which is very
11    unprecedented to get that kind of information from a sovereign,
12    particularly when there is no theory that it would be
13    attachable.  So I would say, for those reasons, I think
14    plaintiff should go back and, either in the context of actually
15    pleading a complaint, or narrower discovery demands, bring
16    those forward.  Otherwise, we are just left with very broad
17    brush demands for everything.  And I think at this stage,
18    that's not appropriate given what your Honor said in March, and
19    that not appropriate because they have gotten so much
20    information, either from the two -- four banks, I'm sorry.
21    Also Standard Charter produced and HSBC provided wire transfer
22    information, as well as the information publicly available
23    about the Republic's contracts, about its budgets, about
24    analyses of the budgets.  That's all out there.  So I think
25    they need to come forward, like any litigants and say I need
```

```
 1    discovery of X-Y.  Your Honor has presided over that in the
 2    past, that's in different areas.  Patents, we were here before
 3    your Honor on that.  In this alter ego situations.  When they
 4    wanted too much, your Honor said no.  And I think those
 5    paradigms apply here, as well.
 6            THE COURT:  We're here today on what is really a new
 7    set of circumstances.  We have the Second Circuit decision
 8    about the pari passu matter.  The Second Circuit has stayed
 9    enforcement of that decision until the Supreme Court rules as
10    to whether it will grant cert or not grant cert.
11            We have an announcement by Mr. Blackman to the Second
12    Circuit that if the Second Circuit affirmed me, the Republic
13    would not obey the order.  And that was a prominent feature of
14    the recent Second Circuit opinion which also in a footnote
15    quoted similarly, let's put it mildly, defiant statements by
16    officials in Argentina.
17            Now, I don't want to get one step further today than
18    what is necessary.  I don't know whether the Supreme Court will
19    grant certiorari on the recent ruling of the Second Circuit.
20    There are apparently some cert petitions about discovery
21    rulings in the past, but although Mr. Boccuzzi makes a number
22    of good points, in detail, the plaintiffs here are still faced
23    with a republic who will not pay what is required of the
24    Republic.  Hopefully, when the Second Circuit decision becomes
25    final, if the Supreme Court turns that down, that defiant
```

```
 1    attitude will change.  But these are steps for the future.
 2    Right now, what is going on is that certain of the plaintiffs
 3    are seeking rather wide-ranging discovery.  Obviously, if they,
 4    or most of them, get paid in compliance with the Second Circuit
 5    ruling, if cert is turned down, then the need for a lot of this
 6    discovery will be gone.  But, the plaintiffs have been
 7    pursuing, in all of these years, various ways to recover their
 8    just debts, including attempts to find assets against which
 9    they could recover.  Admittedly, the position of the Republic
10    to a point that it would not pay, has forced the plaintiffs to
11    engage in difficult quests for means to obtain payment.  And
12    that has, to some extent, involved discovery.
13             The issue of discovery is not something that has come
14    to this Court recently.  The issue about discovery has been, in
15    one way or another, before the Court over these many years.  In
16    dealing with the current discovery issues, the Court cannot
17    really make any assumptions about what will happen on the pari
18    passu issue, whether the Supreme Court will take cert, et
19    cetera, et cetera.
20             The Court needs to deal with the issues as they now
21    stand.  And those issues very prominently include the kind of
22    efforts that plaintiffs have been making over these many years
23    to find assets to recover against.
24             And there is nothing that has happened which makes
25    that an academic question.  I have made certain rulings on
```

```
 1    discovery.  And the Court of Appeals has made certain rulings
 2    on discovery.  One of the central features of those rulings is
 3    that the Foreign Sovereign Immunities Act does not really
 4    prevent discovery of the kind being sought.  That is out of the
 5    picture.  Also, what has been said by this Court in connection
 6    with the narrowing of the discovery requests, refining of
 7    discovery requests, I'm not gonna try to go over or apply what
 8    has been said in the past.  My main answer to Mr. Boccuzzi is
 9    that his client will not pay the debts it owes, and this forces
10    the plaintiffs either to give up, or to pursue a difficult path
11    of getting information and trying to see if any information
12    yields -- to repeat myself, yields information about
13    recoverable assets.
14            And as far as I'm concerned, that is where we start
15    today.  It seems to me that the plaintiffs are attempting to
16    embark on discovery which has surely been refined in response
17    to what has gone on with the Court, and with the parties, in
18    the past.  And it seems to me, speaking generally, that the
19    plaintiffs' discovery requests reasonably reflect the facts of
20    this case, not facts of some other case, but the facts of this
21    case.  And the need, as I have said, either to give up, or to
22    try to pursue the possibility of recovering against the
23    Argentina Republic in view of its position it has taken.
24            Certain of the requests are, on their face, most
25    strange.  Request for discovery regarding military units,
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
 1   diplomatic units, would normally be not even suggested and,
 2   perhaps, quite readily turned down by a Court.  But we do not
 3   have a normal case.  And the plaintiffs are anything but
 4   frivolous in seeking to have information about the possible use
 5   of some branch of the Republic to do something that that branch
 6   does not normally do, that is, deal with assets, et cetera.
 7            On the alter ego point.  In connection with the
 8   hundred million dollars deposited by BCRA at the Federal
 9   Reserve in the United States that was the subject of
10   litigation, both in the District Court and in the Court of
11   Appeals, although the Court of Appeals vacated
12   my -- what the district court did, the Court of Appeals did not
13   really hold against the alter ego concept.  So that is still an
14   open matter.
15            I think, however, that I have ruled about BNA.  And I
16   think we had better leave that off the list as far as alter ego
17   discovery.  But there still is an open issue about BCRA.  And I
18   think as far as discovery is concerned, Enarsa and YPF can be
19   the subject of discovery.
20            As to the banks and the entities involved in the
21   foreign operations and so forth, it seems to me there is one
22   basic proposition.  And that is the head office of a bank with
23   foreign operations can obtain information from its foreign
24   operations and, therefore, can be subject to discovery.  That
25   is a simple and basic proposition.  And that seems to me to
```

```
 1    settle the issue about the banks.
 2              The motions to enforce the existing subpoenas are
 3    granted -- I'm sorry did you wish to speak?
 4              A VOICE:  You have not heard from the banks.
 5              MR. CROFFOOT-SUEDE:  Lance Croffoot-Suede on behalf of
 6    Barclays.  Our first subject to the Aurelius' subpoena, not the
 7    NML's subpoena, other banks are subject to both, and I'm sure
 8    others will be speaking.
 9              The one argument that has not been discussed here by
10    either of the Aurelius plaintiffs, the NML plaintiffs, or the
11    Republic, is the argument that it is premature for the banks to
12    be required to produce discovery in response to requests that
13    are, in the words of the Court, most strange in a case that the
14    Court has characterized, quite appropriately, as a case that is
15    not normal.  It is perfectly true that we are merely third
16    parties here, and that the Court did order this hearing in
17    order to work out with Aurelius NML and the Republic, what the
18    Republic should be doing to respond to Aurelius and NML's
19    discovery requests.  We would humbly submit that if the Court
20    has resolved that issue, which it sounds like the Court has,
21    that the Republic should be dispatched to comply with the
22    Court's directive, produce the discovery that the Court is
23    requiring it to produce, and have Aurelius and NML, in however
24    many days, you know, after the discovery --
25              THE COURT:  A subpoena has been served on Barclays,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
 1    has it not?
 2            MR. CROFFOOT-SUEDE:  Yes, it has, your Honor.  But
 3    there is case law in this Circuit for the fact that third
 4    parties shouldn't be required to respond to subpoenas when the
 5    parties in the litigation may moot the issue.  And the Republic
 6    of Argentina may very well produce discovery which at least IN
 7    part will obviate the need for the banks to respond to these
 8    most strange discovery requests that are --
 9            THE COURT:  I don't see that the discovery request
10    against the banks is most strange at all.
11            MR. CROFFOOT-SUEDE:  Your Honor had referenced earlier
12    the fact that requests for discovery regarding diplomatic units
13    and military operations certainly are not the typical requests
14    for discovery.  And the discovery requests levied against the
15    banks are really not very different in substance at all from
16    the discovery requests lodged against Argentina.  And so all
17    we're saying, your Honor, is before we have to respond to each
18    and every discovery request, can't Argentina produce its
19    discovery, and then have Aurelius and NML come back to us with
20    more tailored discovery requests.
21            THE COURT:  Thank you.
22            MR. KERR:  My name is James Kerr.  And I'm here with
23    Karen Wagner, Counsel for CitiBank and various Citi entities.
24            Your Honor, back in March, you looked at the subpoena
25    that the Aurelius parties had served that defined Argentina to
```

```
 1    consist of 461 entities, and concluded that that really needed
 2    to be tailored.  You heard this afternoon Mr. Rapport indicate
 3    that they had tailored their subpoena.  What they did was to
 4    reduce it to 361 entities and recast the balance of it to
 5    basically request the same data.
 6              Your Honor, I acknowledge your basic frustration here.
 7    And you have indicated that they either need to take discovery
 8    or give up.  We have made an offer, not long after the Second
 9    Circuit issued its FSIA decision, we made a proposal to the
10    Aurelius parties.  And incidentally, the Scheck parties have
11    not served a subpoena.  And we're in discussion as of this
12    moment with the NML parties.
13              We offered to search the SWIFT database of CitiBank
14    and to identify transfers that were being made to and from
15    entities that were clearly a part of the Republic of Argentina,
16    the ministry of economy and finance, other ministries that are
17    indistinguishable from the Republic itself.  We objected to
18    wholly-owned entities and only partially-owned entities on the
19    theory that that got into alter ego grounds.  And to some
20    extent, what they did in tailoring their subpoena was to
21    eliminate --
22              THE COURT:  They being?
23              MR. KERR:  They, Aurelius.
24              THE COURT:  Okay.
25              MR. KERR:  Eliminated most of the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
 1    partially-owned entities that were problematic.
 2              And we did do a search of all of the entities that
 3    they have now listed, including the 361, and have no domestic
 4    accounts.  That doesn't deal with the extraterritorial aspect
 5    of it.
 6              What we propose to do is to search this SWIFT
 7    database which Mr. Cohen, you know, many months ago explained
 8    would provide the financial circulatory system of Argentina.
 9    We would identify wire transfers sent by the Ministry of
10    Economy and Finance, for example, from Argentina, which would
11    show up in the U.S. database.  If that wire transfer were going
12    to another account of the Ministry of Economy and Finance, that
13    would be reflected in the records that we would be making
14    available to them.
15              If an account for the Ministry of Economy and Finance
16    were identified as being in France, that would give them an
17    account number, a location, and the confirmed existence of an
18    account, so they could pursue discovery either directly of that
19    particular account, if it happened to be at a CitiBank branch,
20    or if it happened to be, for example, at a JPM Chase or
21    Barclays branch.
22              Also, the discovery that they take of Bank of America
23    and Barclays, if it shows wire transfer activity going to a
24    CitiBank account that is in the name of one of these entities,
25    that would disclose the target for a search.
```

```
 1              We're trying to make available to them information
 2    that would permit them to, quote, follow the money, which is
 3    what they're interested in doing.
 4              Instead of getting back to us -- and our offer was
 5    made on the seventh of October last year.  Instead of getting
 6    back to us, they adjourned, you know, their response to our
 7    motion to quash, on three occasions, finally responding in May
 8    of this year with this tailored but scarcely different
 9    subpoena.  And they've still never taken us up on our offer,
10    which was not a take-it-or-leave-it offer.  We were trying to
11    suggest a way of a narrowing the number of jurisdictions that
12    needed to be searched.  After all, CitiBank, for example, has
13    offices in more than a hundred countries.  And some of these
14    countries do have bank secrecy laws.
15              And in the case of an entity, an organization like
16    CitiBank, even if the head office does request that
17    information, it has to do it in a way that is consistent with
18    the laws of the jurisdiction, or it's gotta leave that
19    jurisdiction.
20              All of this is by way of saying we have suggested a
21    practical way to get them to where they can identify real
22    property accounts.  They want accounts, this will do it.  And I
23    would submit, your Honor, that this is a way that is both
24    consistent with their interest in identifying property, and our
25    interest in avoiding just an extraordinary and absolutely
```

```
 1    unprecedentedly broad subpoena.
 2              I would also like to, you know, just speak to one
 3    thing Mr. Rapport mentioned.  He said that the Separate Entity
 4    Doctrine is limited entirely to enforcement, attachment, and
 5    execution.  It often comes up in that context, but it's clearly
 6    not limited to it.  He mentioned the Ayyash case, which I think
 7    actually provides guidance.  It was another case seeking
 8    world-wide discovery, world-wide discovery without any
 9    particular reason for pointing in any particular place.
10              The Court said it was simply not a practical and
11    realistic burden to impose on a bank, just because it happened
12    to be in the Southern District of New York.  But I would also
13    say that the Second Circuit has not limited the Separate Entity
14    Doctrine to execution and attachment.
15              Many years ago, they decided the case of INGS vs.
16    Ferguson, in which they declined to require a branch of Chase
17    in Canada to produce documents if it would be in contravention
18    of Canadian law.  Judge Rakoff cited that the opinion in INGS
19    v. Ferguson very recently in his opinion in one of the Motorola
20    cases.  And I would submit that that remains a viable
21    application of the balancing test that the restatement urges be
22    applied before requiring off-shore discovery.
23              We've laid out all of these arguments in our brief.
24    And I really think that it's important for the scope of these
25    subpoenas to be narrowed.  We've offered to work with them.
```

```
 1    We've tried endlessly to come up with a search protocol that
 2    would permit us to --
 3              THE COURT:  Are you negotiating with NML attorneys
 4    now?
 5              MR. KERR:  I'm talking about --
 6              THE COURT:  No, I mean I thought you said you were
 7    negotiating with --
 8              MR. KERR:  We have been -- our discussions with NML
 9    are continuing --
10              THE COURT:  So they're continuing.
11              MR. KERR:  They're continuing.
12              THE COURT:  All right.
13              MR. KERR:  And we have offered to do this with the
14    Aurelius parties.  They basically say we want the entire 361,
15    you know, we won't stop at anything short of that.
16              I guess we have been trying to come up with a search
17    protocol that will even -- and one thing they did do that was
18    positive, they limited the time frame covered by their search.
19    But one of the problems with that, is even with, you know, high
20    speed computer technology, when you have that many names to
21    search, and even when you shrink it down to the 150 names that
22    we were using in one of the searches that we have been trying
23    develop, it slows the search down.  You can only do a few days
24    at a time.  So it becomes a very more time-intensive and
25    expensive proposition.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  Can I interrupt you?
 2              MR. KERR:  Yeah, I -- may I say one more thing, your
 3    Honor?
 4              THE COURT:  Sure.
 5              MR. KERR:  They have not offered to reimburse us for
 6    our expenses in doing that.
 7              THE COURT:  Okay.
 8              Now, I think you can sense from what I said that I
 9    have a basic, and I emphasize basic view, that the discovery
10    requested should go forward.
11              Now, what you have presented in your statement is
12    certainly not -- it's not unresponsive at all.  And what I
13    think you're saying is that you're trying to respond to the
14    request and the subpoena, whatever it is, in the way that you
15    have described.  Now, I don't know enough to evaluate the
16    details of what you have said, but on the face of it, what you
17    have said makes sense.
18              And I would just go back to Mr. Rapport.
19              MR. RAPPORT:  Rapport, your Honor.
20              THE COURT:  Isn't it something that you should respond
21    to?
22              MR. RAPPORT:  Yes, your Honor.  And I would like the
23    opportunity to do that.  Much of what you heard today is news
24    to me.  So, for example, I did not know that they had searched
25    for domestic accounts for all 363 entities.  I did not know
```

```
 1    about --
 2              THE COURT:  What Mr. Kerr said is that he had made
 3    a --
 4              MR. RAPPORT:  Yes.
 5              THE COURT:  -- presentation, and that you had not
 6    responded to that presentation -- I'm not talking about a
 7    presentation in court --
 8              MR. RAPPORT:  I understand.
 9              THE COURT:  -- I mean presentation --
10              MR. RAPPORT:  That's not true.
11              What they made was an offer.  They were -- just a
12    little bit of context.
13              Days before we filed our motion to compel, after
14    10 months of trying to negotiate, the banks all come together
15    with this coordinated effort where, the day or two before we
16    file our brief, or the day or two after we file our brief, they
17    basically all give us the same offer.  And the offer is, only
18    the 94 entities that the Republic has blessed.  They are only
19    going to search U.S. dollar.  They are only going to search for
20    U.S. based accounts or lending relationships.  And not all of
21    the banks even agreed to do that.  None agreed to produce the
22    information, but they said well, we'll look for it, and then
23    we'll decide whether or not they are foreign law issues, and it
24    was all,  this is the deal, and no followups.  This is --
25              THE COURT:  No what?
```

```
 1            MR. RAPPORT:  No followups.  This is the deal and
 2   if -- and this is going to be full satisfaction of the
 3   subpoena.  We said back to them -- we didn't say no.  We had
 4   reasonable questions back to them.  We said explain how the
 5   searches are going to be conducted.  All that you heard today
 6   about how the number of names, and two days, whatever, that has
 7   not been part of the discussion.  We have been saying to them
 8   let's have a dialogue about search protocols.  They're not
 9   willing to have that dialogue with us.  We say to them, why
10   aren't you going to produce information from your corporate
11   subsidiaries.  We say to them, why are you limiting it to the
12   94 entities, why are you not searching for information outside
13   of the U. S.  Why not search for assets or relationships
14   outside of the U.S.  We asked them, and we say to them, so why
15   is it reasonable for us to forfeit further compliance with the
16   subpoenas just because you do this.
17            They write back two weeks later and say that they are
18   going to assume that we have rejected the proposals.  We didn't
19   reject the proposals, we asked reasonable follow up questions
20   that you would expect in a meet-and-confer process.
21            Then, once your Honor issues this March 7 opinion, we
22   tailor our requests, and have our reply brief.  Days -- or
23   weeks, I should say, before that previously-scheduled hearing
24   in August, they say let's have another meet-and-confer.  And at
25   that meet-and-confer, they say, well, why don't you eliminate
```

43

```
 1    wholesale certain categories of entities; why don't you
 2    eliminate this category, why don't you eliminate that category.
 3              We say to them, you know what, there is no good reason
 4    for us to eliminate these categories.  If it is a question of
 5    burden, we're glad to have that conversation with you, and
 6    we'll talk to you about it, and tell us what the search
 7    protocol is, we'll give you search terms, we'll figure it out.
 8    Nothing.  So that's really where we are.  So if they want to
 9    talk about --
10              THE COURT:  Can I interrupt you?  Okay.
11              MR. KERR:  Your Honor, if I may --
12              THE COURT:  It very often happens that people in
13    negotiations or discussions outside of court are a little
14    rougher than they are in court.
15              Now, I have heard what you have said, Mr. Rapport, I
16    have heard what Mr. Kerr said.  I'm not going to hold a hearing
17    and take evidence and make judgments on credibility about what
18    happened in the dealings between you two.  All I know is, that
19    there should be dealings in good faith.  There are complexities
20    here.  It does not take away from my view that on the basic
21    question of whether there will or will not be a valid subpoena,
22    if a subpoena has been served, then the subpoena has been
23    served.  It should lead to discussion.  It should lead to a
24    discussion of the kind of thing Mr. Kerr described very well,
25    and you described very well.  But that discussion cannot
```

44

```
 1   continue or be concluded this afternoon.  I have got motions
 2   before me.
 3           And I'm granting all motions to enforce the subpoenas,
 4   and denying all motions to quash.  And I'm doing that with
 5   complete respect for what has been presented by Mr. Kerr and
 6   others, and knowing the fact of life that the discussions have
 7   got to exist.
 8           The carrying out of this process is complicated.  And
 9   it will take discussions.  And that will take place after
10   today's hearing, it will not be finished at today's hearing.
11   And nothing will be finished, except I'm granting, I'm ruling
12   on the motions, as I have said.
13           And, with that, we are concluded.
14           If somebody could propose an order, I will -- on
15   notice, I'll sign the order.
16           MR. COHEN:  Thank you, your Honor.
17           MR. RAPPORT:  Thank you, your Honor.
18           (Adjourned)
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300